## COMMISSIONER OF INTERNAL REVENUE v. BOEING.

### No. 9071.

Circuit Court of Appeals, Ninth Circuit.
Aug. 29, 1939.

Rehearing Denied Oct. 5, 1939.

Writ of Certiorari Denied Dec. 11, 1939.

See 60 S.Ct. 295, 84 L.Ed. ——.

James W. Morris, Asst. Atty. Gen., and Sewall Key, F. E. Youngman, and Carlton Fox, Sp. Assts. to Atty. Gen., for petitioner.

Hollister T. Sprague, Elmer E. Todd, Lowell P. Mickelwait, and Todd, Holman & Sprague, all of Seattle, Wash., for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This proceeding involves two appeals which were consolidated for purposes of hearing and decision. They involve federal income tax for the calendar years 1933 and 1934 for which years the Commissioner determined deficiencies. The Board of Tax Appeals, upon petitions filed by the respondent herein, determined that there were no deficiencies and the Commissioner brings the cases here for review. The same question is involved in both appeals, namely, whether the respondent taxpayer was entitled to the benefit of the capital gain provisions of the Revenue Acts of 1932 and 1934.[1] The applicable provisions are Sec. 101 of the Revenue Act of 1932, C. 209, 47 Stat. at L. 169, 26 U.S.C.A. § 101 note, and Sec. 117 of the Revenue Act of 1934, C. 277, 48 Stat. at L. 680, 26 U.S.C. § 101, 26 U.S.C.A. § 101, which provide, roughly, that capital gain means gain from the sale or exchange of capital assets consummated after December 31, 1921. The term "capital assets" is defined as follows: " * * property held by the taxpayer for more than two years (whether or not connected with his trade or business),. but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business." Section 101 of the Revenue Act of 1932, subsection (c) (8), 26 U.S.C.A. § 101 note.

It appears that the taxpayer inherited certain timberlands in 1890 from his father, and from his mother in 1910. He acquired additional timberlands by purchase at various times from 1903 through 1912. All of these properties were held by him

---

[1] A further question as to whether the income from certain trusts was taxable to respondent is not before this court, the Commissioner having abandoned his appeal on this point.

for investment purposes. On July 31, 1922, the taxpayer, along with the co-owners of some of these timberlands, entered into a contract with the Greenwood Logging Company for the logging of a portion thereof. This contract contained the following provision,

"The Owners hereby employ the Logging Company to log said land and to perform the services herein set forth for the compensation herein stated.

"The Logging Company hereby accepts employment from the Owners for the logging of said land and for the other services herein agreed upon."

Upon the terms of the contract the logging company agreed to construct a logging railroad, logging camps and other necessary structures, at its own expense. It further agreed to cut and remove at least 600,000,000 feet of logs each year during the term of the contract. It was further provided that the logging company should pay all taxes and assessments of every kind that should be levied against the land and timber during the period of the contract. It was further provided that all logs cut and removed from the land should be transported by the logging company at tidewater on Grays Harbor and sold by it to purchasers at the current market price. The moneys received by the logging company were to be divided as follows: One-third of the gross proceeds of all logs sold to the owners in payment for their interest in the logs, including stumpage and stumpage rights; and the remaining two-thirds of the gross proceeds to the logging company in payment for its services.

On July 1, 1933, the taxpayer, along with his co-owners, entered into a similar contract with the Crescent Logging Company. This contract likewise provided that the logging company should construct the necessary logging roads, etc., at its own expense. The contract further provided that title to all the logs and other timber products to be cut or removed from the lands should remain in the owners at all times until sold. Under this contract the purchasers of the timber were to be billed separately for the amount due to the owners and remittance made directly to the owners. It was further provided that the work of cutting and removing the timber should be completed on or before January 1, 1935, and if not completed by that date the logging company should purchase the timber remaining on the lands at the current market price, to be paid for within 60 days, and removed within ten years thereafter.

The taxpayer gave practically no time or attention to the operations under these contracts during the taxable years involved. Routine reports of sales of logs came into the office maintained by the taxpayer where they were filed by an employee. This took only a negligible amount of time by the employee. From time to time the books of the logging company were inspected by an employee of the taxpayer.

During the taxable year 1933 the taxpayer realized profits from sales of timber pursuant to the Greenwood Company contract of $2,375.25, and from sales pursuant to the Crescent Company contract of $8,099.65, or a total of $10,474.90. During the taxable year 1934 the taxpayer realized profits from sales of timber made pursuant to the Crescent Company contract of $5,906.25, and sustained a loss of $1,004.41 from sales under the Greenwood Company, or a net profit in 1934 of $4,901.84.

From the above facts the Board concluded that these gains and losses resulted from the sale of "capital assets" within the statutory definition; that the timber sold did not constitute "stock in trade of the taxpayer" nor "other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year," nor "property held by the taxpayer primarily for sale [to customers] in the [ordinary] course of his trade or business."[2]

The petitioner assigns as error numerous findings of the Board as not supported by the evidence and also assigns as error the failure of the Board to make certain findings. The only evidence taken before the Board was in the form of documentary exhibits and oral testimony by the respondent taxpayer and his financial secretary. The petitioner offered no evidence at the hearing before the Board. There is, therefore, no conflict in the testimony.

[2] The bracketed portions are the changes added to the Revenue Act of 1934 and did not appear in the Revenue Act of 1932. The Board held that the changes made no difference in the result reached in both cases.

At the outset we are confronted with the contention of the respondent that the Commissioner is appealing from findings of the Board on factual issues which are binding on this Court if supported by any substantial evidence. It is the respondent's theory that whether or not the timber sold by the respondent under the cutting contracts resulted in a gain derived from the sale of capital assets is an ultimate fact and can be disturbed by this Court only if such finding is unsupported by any substantial evidence.

 The power of this Court to review decisions of the Board of Tax Appeals is statutory. Sec. 1003 (b) of the Revenue Act of 1926, 26 U.S.C. § 641 (c), 26 U. S.C.A. § 641 (c), provides: "Upon such review, such courts shall have power to affirm or, if the decision of the Board is not in accordance with law, to modify or to reverse the decision of the Board, with or without remanding the case for a rehearing, as justice may require."

In Helvering v. Rankin, 295 U.S. 123, 131; 55 S.Ct. 732, 736, 79 L.Ed. 1343, 1934, the Supreme Court said: "The Court of Appeals is without power, on review of proceedings of the Board of Tax Appeals, to make any findings of fact. 'The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided.' Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 725, 49 S.Ct. 499, 502, 73 L.Ed. 918. The function of the court is to decide whether the correct rule of law was applied to the facts found; and whether there was substantial evidence before the Board to support the findings made. See Phillips v. Commissioner, 283 U. S. 589, 599, 600, 51 S.Ct. 608, 75 L.Ed. 1289; Burnet v. Leininger, 285 U.S. 136, 138, 52 S.Ct. 345, 76 L.Ed. 665; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 294, 55 S.Ct. 158, 79 L.Ed. 367. Unless the finding of the Board involves a mixed question of law and fact, the court may not properly substitute its own judgment for that of the Board."

In Helvering v. Tex-Penn Co., 300 U. S. 481, 57 S.Ct. 569, 81 L.Ed. 755, 1937, the question presented for determination was whether or not a certain reorganization scheme came within the non-recognition of gains provisions of the Revenue Act of 1918, § 202 (b), 40 Stat. at L. 1060. This question in turn depended on whether there had been an exchange of stock only or whether cash had also formed part of the consideration for the exchange. The Board had found that the taxpayer was liable for deficiencies. The Circuit Court of Appeals had reversed and certiorari was granted, 3 Cir., 83 F.2d 518. The Supreme Court said, 300 U.S. at page 483, 57 S.Ct. at page 570, 81 L.Ed. 755: "The first ultimate finding is (28 B.T.A. 917, at page 950): 'The consideration received by Tex-Penn on or about August 1, 1919, in exchange for its assets consisted of $350,000 in cash and 1,007,834 shares of Transcontinental stock of no par value.'"

The Court then set out what it terms the "circumstantial facts" and then said, 300 U.S. at pages 490, 491, 57 S.Ct. at page 573, 81 L.Ed. 755: "The foregoing includes the substance of all the findings of circumstantial facts material to the question under consideration. They must be taken as established if supported by substantial evidence. [Citing cases.] There is no suggestion that they are not amply sustained. In addition to and presumably upon the basis of these findings, the Board made its 'ultimate finding.' And upon that determination it ruled that the transaction was not within the nonrecognition provisions of section 202 (b). The ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary, or circumstantial facts. It is subject to judicial review and, on such review, the court may substitute its judgment for that of the Board. Helvering v. Rankin, ubi supra."

Respondent has cited decisions of the Circuit Court of Appeals,[3] some of which

3 Old Mission Portland Cement Co. v. Helvering, 69 F.2d 676, 9 Cir., 1934, affirmed, 293 U.S. 289, 55 S.Ct. 158, 79 L. Ed. 367, 1934; Westlake Pub. Market v. Commr., 69 F.2d 291, 9 Cir., 1934; Week v. Helvering, 68 F.2d 693, 9 Cir., 1934, certiorari denied 292 U.S. 657, 54 S.Ct. 868, 78 L.Ed. 1505, 1934; Helvering v. Ward, 79 F.2d 381, 8 Cir., 1935; Randolph v. Commr., 76 F.2d 472, 8 Cir., 1935, certiorari denied 296 U.S. 599, 56 S.Ct. 116, 80 L.Ed. 425, 1935; Commr. v. Gerard, 75 F.2d 542, 9 Cir., 1935.

are apparently in conflict with the above cited cases. He calls our attention to three decisions by our own circuit, Tricou v. Helvering, 68 F.2d 280, 9 Cir., 1933, Winnett v. Helvering, 68 F.2d 614, 9 Cir., 1934, and Richards v. Commr., 81 F.2d 369, 106 A.L.R. 249, 9 Cir., 1936. But these cases must be read in light of the more recent expressions of the final court.

We think that the ultimate findings of the Board above referred to in this case are conclusions of law, or mixed questions of law and fact within the meaning of the Supreme Court rulings and as such are subject to independent judicial review by this court.

The contentions of the Commissioner on these appeals may be briefly summarized as follows: The contracts between the logging companies and the "Owners" (the taxpayer and others) were contracts of employment and not contracts of sale of timber to the logging companies; the taxpayer did not sell "timber" during the taxable years in question, but rather "logs"; the "logs" had been produced by time-consuming operations; these operations constituted doing business and the proceeds from the sale of logs did not represent proceeds from a mere conversion of capital but rather such proceeds represented profit upon the sale of property held primarily for sale in the course of trade or business.

We are convinced, as was apparently the Board, that the contracts with the logging companies were not contracts of sale. Reading the contracts in their entirety, the conclusion is inescapable that the companies were employed to cut the timber, deliver it to tide water and there sell it for and on behalf of the owners. As compensation for their services and for the risks involved the companies were paid two-thirds of the gross selling price. It is apparent that the "Owners" did not sell the timber to the logging companies.

But we agree with the Board that the mere fact that the respondent engaged the logging companies to put the timber in a salable condition is not decisive of the question. It is true that the respondent here was selling "logs" cut from his lands, but we do not agree with the Commissioner that merely because a sale of "logs" took place rather than "timber", the taxpayer here was engaged in the "business" of selling logs. The operations of the tax-

payer prior to a sale of the timber, looking toward putting the same in a salable condition, should not determine whether the subsequent sale amounted to an engaging in a trade or business.

Nevertheless, we are convinced that the respondent was engaged in a trade or business, within the terms of the statute in question. The Board found as a fact, based upon oral testimony of the taxpayer as to his purpose in selling the timber, that the motive of the taxpayer was to liquidate his investment. The respondent taxpayer argues that this finding of the Board, supported as it is by substantial evidence, is decisive of the question of whether the taxpayer was engaged in a trade or business. This court has heretofore, in the case of Richards v. Commissioner, supra, rejected the liquidation test in determining the question here involved, 81 F.2d at page 373. Nor do we agree with the respondent taxpayer that the fact that independent contractors or agents are engaged to cut, remove and market the timber is a sufficient ground for holding that respondent was not engaged in a trade or business within the meaning of the statute. In Welch v. Solomon, 99 F.2d 41, 43, 9 Cir., 1938, this court said: "The personal attention which a taxpayer gives to a business is certainly not decisive as to whether a resulting profit is ordinary income or capital gain. One may conduct a business through others, his agents, representatives, or employees. The business is nonetheless his because his chooses to let others bear all of the burdens of management."

From the cases it would appear that the facts necessary to create the status of one engaged in a "trade or business" revolve largely around the frequency or continuity of the transactions claimed to result in a "business" status. In Miller v. Commissioner, 102 F.2d 476, 479, 9 Cir., Mar. 15, 1939, this court, in determining whether or not the activities of the taxpayer in an investment field were such as to put him in. a "trade or business" within the meaning of the deduction provisions of the Revenue Act, said: "Other cases have recognized that though the taxpayer takes no part in the enterprises as to which he is an investor, he may nonetheless be considered to be carrying on a business if the transactions concerning his investments are substantial and frequent as distinguish-

ed from occasional or isolated. Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389; Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397; Rogers v. United States, 41 F.2d 865, Ct.Cl., 1930; Walker v. Commr., 63 F.2d 351, CCA 3, 1933 affirming 20 B.T.A. 937; Stephenson v. Commr., 101 F.2d 33, CCA 6, Jan. 11, 1939; Schwinn v. Commr., 9 B.T.A. 1304; Von Echt v. Commr., 21 B.T.A. 702; Alverson v. Commr., 35 B.T.A. 482; Barney v. Commr., 36 B.T.A. 446. In addition to the cases cited, two Circuit Court cases[4] have very recently been decided which applied, in ascertaining the character of the taxpayer's investment activities, the test of the extent of those activities. * * *"

Compare also: Richards v. Commr., supra; Phipps v. Commr., 54 F.2d 469, 2 Cir., 1931; Welch v. Solomon, supra, 99 F.2d at page 44.

We think that it cannot be disputed that respondent sold logs through the logging companies. The question is whether he was in the "business" of selling logs. The Board, in its opinion, stated:

"The timber was not held for sale to customers in the ordinary course of the taxpayers trade or business. This clause connotes a business regularly carried on and property continuously held out for sale rather than as here—casual sales [citing for comparison, Phipps v. Commr., supra, and Richards v. Commr., supra.]

* * * * * *

"There was no continuous course of dealing with a group of regular buyers which would be necessary to the conclusion that the timber was held for sale to customers in the ordinary course of trade or business. The sales of timber from the tracts of land here in question were isolated transactions by the petitioner, involving merely casual buyers, as distinguished from 'customers'.

* * * * *[°] * *

"* * * We are of the opinion that there was not in the case at bar any such regularity of dealing in the specific property as is required by the statutory provision invoked by the respondent [Commissioner]. Such regularity and continuity of dealing are in our opinion necessary to the concept of sales to customers in the ordinary course of business which is embodied in the statute."

In determining that the sales by the respondent here were "casual", that there was "no continuous course of dealings with a group of regular buyers", that the sales were "isolated transactions" involving "merely casual buyers", and that there was no "regularity and continuity of dealing", the Board must have meant one of three things: (1) that the respondent was not engaged in a "trade or business" because he was a retired business man whose "business if any, during the taxable year could be described only as management of his investments" [Opinion of the Board] and thus that the sale of the "timber" was "casual" in the sense that it was "isolated" from his "business" of managing his investments; (2) that the timber was sold to the logging companies who were thus "casual buyers" and not "regular buyers" or customers; or (3) that the sales by the logging companies for and on behalf of the Owners were "casual".

If we take the first meaning, we think the Board was wrong in holding that the respondent was not engaged in a trade or business. Richards v. Commr., supra; Welch v. Solomon, supra. The second meaning is foreclosed by virtue of the fact that the contracts between the Owners and the logging companies did not result in sales of timber to the companies. Compare: Blodgett v. Commr., 13 B.T.A. 1388, 1928;[5] Foster v. Commr., 57 F.2d 516, CCA 5, 1932; Brown v. Commr., 69

---

[4] The court was referring to Kales v. Commr., 101 F.2d 35, 6 Cir., 1939, and Kane v. Commr., 100 F.2d 382, 2 Cir., 1938.

[5] The Blodgett case serves a useful purpose in distinguishing the instant case. In that case the Board found: "In 1923 the petitioner contracted with reference to the standing timber on the Mississippi timber lands * * *. The contract provided that the vendees were to cut the standing timber and pay for it as sold by them on the basis of a certain percentage of the gross selling price."

The question before the Board was whether the income to the taxpayer was capital gains or ordinary income. The Board held that the sums realized were gains derived from sales of capital assets, and said: "The contract of 1923 with respect to the timber on the Mississippi tract was, considering all its terms, a contract of sale of the entire standing timber and did not constitute the other contracting parties agents of the petitioner so that, through them, he was engaged in lumbering operations."

F.2d 863, 5 Cir., 1934, certiorari denied, 293 U.S. 579, 55 S.Ct. 91, 79 L.Ed. 676; Carroll v. Commr., 70 F.2d 806, 5 Cir., 1934. In all these cases, the contracts between the taxpayers and the logging companies resulted in a sale of the timber to the logging companies.

■■ The third meaning is the only one left to consider. The Commissioner contends that there is no evidence to support such a finding. To this contention we agree. We have searched the record for any trace of evidence, whether documentary or oral, to support the finding. The record is bereft of any such evidence. What evidence there is touching the question looks toward a contrary finding. The following excerpts from the testimony of the taxpayer's financial secretary all indicate a continuous course of dealing:

"In 1933 there were 3,783,369 feet board measure of timber cut and sold under the Greenwood contract. * * * Mr. Boeing only had a partial interest, but that was the total footage cut. In the Crescent Logging Company contract, Mr. Boeing sold them his half interest in 14,537,960 feet. * * * Payments were simply made in accordance with the terms of the contract by receiving remittances from the purchasers under the contracts at the stipulated times for timber they had purchased."

"Question: Under these contracts [Greenwood and Crescent contracts] the logging company is required to furnish him [Mr. Boeing] information as to the quantity of logs that they have delivered to the * * * boom at Port Angeles; did he receive those? Answer: Yes."

"Question: In each instance that you received funds under these contracts, it was because of a sale having been made to an outsider outside the logging company and outside of Mr. Boeing? Answer: By the logging company itself."

"Question: How often did he receive those reports as to the logs on hand unsold? Answer: The second contract, I don't recall. That may have been received when they were operating once a month or so."

The Commissioner had determined that the respondent here was engaged in a "trade or business." This "ruling has the support of a presumption of correctness, and the petitioner has the burden of prov-

ing it to be wrong." Miller v. Commissioner, supra, and cases cited. The Board's finding that the sales were "casual" cannot be upheld in the absence of any substantial evidence, and when this finding is disturbed there is nothing upon which to base an affirmance of the Board's decision.

The decisions of the Board of Tax Appeals are reversed.