Colburn **HVIDSTEN, Jr.**, and **Marguerite Hvidsten, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 3753.**

United States District Court
D. North Dakota,
Northeastern Division.

Aug. 10, 1960.

Robert Vaaler of Day, Stokes, Vaaler & Gillig, Grand Forks, N. D., for plaintiffs.

Robert Vogel, U. S. Atty., Fargo, N. D., Bruno Lederer, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

REGISTER, Chief Judge.

This action is brought by plaintiff taxpayers for a refund of $6,677.46 in income taxes paid for the years 1955 and 1956. Plaintiffs are husband and wife.

There is little, if any, dispute as to the basic facts. The pertinent facts, which have been stipulated into the record, are as follows: Plaintiffs purchased 239 acres of land in June, 1947, for which they paid $54,000. Said land, at the time of purchase, was located south of and adjacent to the city limits of the city of Grand Forks, North Dakota. In October, 1947, plaintiffs sold 188 acres of said land for $42,000. The remaining 51 acres were platted by plaintiffs into what is known as the Hvidsten Subdivision to the city of Grand Forks. The tract was platted into and consists of 152 lots. The plat of said subdivision was duly filed and recorded in the office of the Register of Deeds for Grand Forks County, North Dakota, on August 12, 1948. The number of lots in said subdivision which have been sold by plaintiffs, and the years in which the same were sold, are as follows: 1948, fifteen lots; 1949, none; 1950, four lots; 1951, nine lots; 1952, eleven lots; 1953, twenty-three lots; 1954, thirty-five lots; 1955, twenty-one lots; and 1956, fifteen lots.

Plaintiffs filed timely income tax returns for each of the years 1955 and 1956. In March of 1958, plaintiffs filed amended income tax returns for the years 1955 and 1956; attached to each of such amended returns for each year was a claim for refund of taxes for the said years. The amount of the refund claimed was $632.81 for 1955; for 1956 the refund claimed was $495.50.

In October, 1957, the Internal Revenue Service audited plaintiffs' income tax return for the calendar year 1955, disallowed the long term capital gain treatment on the sale of lots as reported in the original return filed and assessed a deficiency against plaintiffs in the amount of $2,074.85 for the year 1955. In August, 1957, the IRS audited plaintiffs' income tax return for 1956 and disallowed the long term capital gain treatment with respect to the sale of lots and assessed a deficiency for the year 1956 in the sum of $2,641.46. No change in plaintiffs' original returns for 1955 and

1956 was made by IRS except to disallow the capital gain claimed on the sale of lots, and to determine that the income from such sales was ordinary income. No action was taken by IRS either allowing or disallowing claims for refund which were filed for 1955 and 1956, which claims were attached to the amended returns for those years and which were filed in March, 1958.

On June 23, 1959, plaintiffs paid the deficiencies, plus interest, for each of the years 1955 and 1956 in the respective amounts of $2,471.64 and $2,977.51. Receipts for each of the years involved were issued.

Plaintiffs prepared, executed and caused to be filed on August 13, 1959, claims for refund for the calendar years 1955 and 1956 in the respective amounts of $3,104.45 and $3,473.01. On October 17, 1959, IRS caused to be mailed to plaintiffs by registered mail notices informing plaintiffs that their claims had been disallowed and rejected.

Additional pertinent facts established by the evidence adduced at the trial, with respect to the issues involved, will be stated as said issues are discussed.

The first of the two issues presented for determination is whether plaintiffs are entitled to the benefits of the statutes allowing capital gain treatment to the sale of the lots; the second of said issues is whether plaintiffs may deduct from their 1955 and 1956 income certain losses sustained in connection with a house-building transaction operated and maintained under the name and style of Construction, Inc.

The decision as to the first issue must rest upon the interpretation of the pertinent parts of Sections 1221 and 1237, Internal Revenue Code of 1954, 26 U.S. C.A. §§ 1221, 1237.

"Section 1221. Capital Asset Defined. For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \* \*

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

\* \* \* \* \* \*

"Section 1237. Real Property Subdivided for Sale. (a) General.—Any lot or parcel which is part of a tract of real property in the hands of a taxpayer other than a corporation shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale solely because of the taxpayer having subdivided such tract for purposes of sale or because of any activity incident to such subdivision or sale, if—

"(1) such tract, or any lot or parcel thereof, had not previously been held by such taxpayer primarily for sale to customers in the ordinary course of trade or business (unless such tract at such previous time would have been covered by this section) or, in the same taxable year in which the sale occurs, such taxpayer does not so hold any other real property; and

"(2) no substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer or is made pursuant to a contract of sale entered into between the taxpayer and the buyer. For purposes of this paragraph, an improvement shall be deemed to be made by the taxpayer if such improvement was made by—

"(A) the taxpayer or members of his family (as defined in section 267 (c) (4)), by a corporation controlled by the taxpayer, or by a partnership which included the taxpayer as a partner; or

"(B) a lessee, but only if the improvement constitutes income to the taxpayer; or

"(C) Federal, State, or local government, or political subdivision thereof, but only if the improvement constitutes an addition to basis for the taxpayer; and

"(3) such lot or parcel, except in the case of real property acquired by inheritance or devise, is held by the taxpayer for a period of 5 years."

■ Certain regulations were promulgated by the Commissioner of Internal Revenue with reference to said Section 1237. While the statute is the primary authority (Boykin v. Commissioner of Internal Revenue, 8 Cir., 260 F.2d 249), "A Treasury Regulation has the force and effect of law * * * if it is consistent with and reasonably adapted to the enforcement of a revenue statute". Granquist v. Hackleman, 9 Cir., 264 F.2d 9, 16.

The Treasury Regulation involved herein is as follows:

"Treasury Regulations 118:

"Sec. 1.1237–1. *Real property subdivided for sale*—

"(a) *General rule*—

"(1) *Introductory.* This section provides a special rule for determining whether the taxpayer holds real property primarily for sale to customers in the ordinary course of his business under section 1221(1). This rule is to permit taxpayers qualifying under it to sell real estate from a single tract held for investment without the income being treated as ordinary income merely because of subdividing the tract or of active efforts to sell it. The rule is not applicable to dealers in real estate or to corporations, except a corporation making such sales in a taxable year beginning after December 31, 1954, if such corporation qualifies under the provisions of paragraph (c) (5) (iv) of this section.

\*    \*    \*    \*    \*    \*

"(b) *Disqualification arising from holding real property primarily for sale*—

"(1) *General rule.* Section 1237 does not apply to any transaction if the taxpayer either—

"(i) Held the lot sold (or the tract of which it was a part) primarily for sale in the ordinary course of his business in a prior year, or

"(ii) Holds other real property primarily for sale in the ordinary course of his business in the same year in which such lot is sold.

"Where either of these elements is present, section 1237 shall be disregarded in determining the proper treatment of any gain arising from such sale.

"(2) *Method of applying general rule.* For purposes of this paragraph, in determining whether the lot sold was held primarily for sale in the ordinary course of business in a prior year, the principles of section 1237 shall be applied, whether or not section 1237 was effective for such prior year, if the sale of the lot occurs after December 31, 1953, or, in the case of a corporation meeting the requirements of paragraph (c) (5) (iv) of this section, if the sale of the lot occurs in a taxable year beginning after December 31, 1954. Whether, on the other hand, the taxpayer holds other real property for sale in the ordinary course of his business in the same year such lot was sold shall be determined without regard to the application of section 1237 to such other real property.

\*    \*    \*    \*    \*    \*

"(c) *Disqualification arising from substantial improvements*— * * *

\*    \*    \*    \*    \*    \*

"(4) *When an improvement is substantial.* To prevent the application of section 1237, the improvement itself must be substantial in character. Among the improvements considered substantial are shopping centers, other commercial or residential buildings, and the installation of hard surface roads or utilities such as sewers, water, gas, or

electric lines. On the other hand a temporary structure used as a field office, surveying, filling, draining, levelling and clearing operations, and the construction of minimum all-weather access roads, including gravel roads where required by the climate, are not substantial improvements."

Prior to the enactment of the Internal Revenue Code of 1954, the computations of capital gains from the sale of capital assets were authorized and governed by Section 117(j) of the Internal Revenue Code of 1939 and amendments thereto, 26 U.S.C.A. § 117(j). In making the revisions and improvements in the Internal Revenue laws which ultimately resulted in the Internal Revenue Code of 1954, Congress included a special subchapter P under Chapter 1 of the Code, 26 U.S.C.A. § 1201 et seq., which subchapter deals with capital gains and losses. Therein Congress explained in greater detail the purpose and intent of the capital gain provisions of the law and established special rules for determining capital gains and losses on various types of transactions. Part IV, Sections 1231 to 1241, incl., Internal Revenue Code of 1954, 26 U.S.C.A. §§ 1221–1241.

Section 1237, Internal Revenue Code of 1954, apparently has no counterpart in any previously enacted Internal Revenue act. Counsel have informed the Court that they have been unable to find any decision in which such section has been interpreted or applied to a factual situation such as exists here. The reasons for said section being included in the statute are revealed by a study of the Senate Committee Report which accompanied the bill during its passage through the legislative mill. The applicable portions of that Report read as follows (U.S.Code Cong. and Adm.News 1954, pp. 4748, 5085):

"G. Sale of Subdivided Real Estate (sec. 1237)

"(1) House Changes accepted by committee: At present, an individual who subdivides real property held for investment purposes is likely to be held a dealer and subjected to ordinary income tax rates on the entire long term gain. However, an individual holding real property for investment may find that the only way to dispose of it at a reasonable price is to subdivide it into lots. 83rd Cong., 2d Sess., S.Rep.No. 1622 (1954) 115. General Report on Section 1237; and

"Subsection (a) (1) specifically makes the section inapplicable in two situations. This denial covers first the situation where the taxpayer previously held the property for sale to customers in the ordinary course of trade or business. This denial will not operate in a situation where the taxpayer was in a prior year deemed to have so held this property if in that year he would have been entitled to make use of the provisions of this section. Senate Committee Report, 83rd Cong., 2d Sess., S.Rep.No. 1622 (1954) 441."

It appears reasonable to conclude that Congress recognized that under the then existing law (Section 117(j) of the 1939 Code), a subdivider of real property, who was not a "dealer" in the ordinarily accepted meaning of such term and who was not otherwise in the real estate business, was being inequitably burdened, from a tax standpoint, by resale of his land following subdivision thereof. Section 1237 of the 1954 Code was specifically designed to correct such inequity.

In effect this law (Section 1237) established a series of conditions which a taxpayer must satisfy in order to invoke its provisions.

"The general rule is that lots in a tract do not cease to be capital assets (assuming that they otherwise are capital assets) in the hands of an individual owner merely because the owner subdivides the tract and carries on sales activity incident to a disposition of the lots. This rule ap-

plies, however, only if *all* the following conditions are satisfied:

"1. The tract, or any lot therein, has not previously been held by the taxpayer primarily for sale to customers (unless at such time Section 1237 would have applied).

"2. The taxpayer does not in the taxable year hold other real property for such purpose. The statute literally would seem to require only that *either* requirement (1) or (2) be met. The legislative history is to the effect that *both* must be met. See Senate Report No. 1622, 83rd Cong., 2d Sess., page 442.

"3. The lot sold (unless acquired by devise or inheritance) has been held for five years or more.

"4. The taxpayer has not improved the tract. Improvements which are not 'substantial' in themselves, or which do not 'substantially' enhance the value of the particular lot sold, may be disregarded." 42 A.B.A. Journal, p. 630.

The evidence herein conclusively establishes that plaintiffs have satisfied conditions two and three, as quoted above. The arguments and contentions of respective counsel as to whether plaintiffs have satisfied conditions one and four, however, are diametrically opposed to each other.

It should be noted that litigation developed from the 1948 sale of lots in Hvidsten's Subdivision (Hvidsten v. U. S., Civil No. 3056, ND 1956). In that case it was determined by jury verdict that the lots sold by plaintiff from this tract in 1948 were held primarily for sale to customers in the ordinary course of trade or business and that the profits derived therefrom were taxable as ordinary income. That case was decided under the former law. Plaintiffs contend that such prior judgment is entitled to no force or effect because of the subsequent revision in the law—accomplished by the enactment of Section 1237. The Government contends that the issue is res judicata.

In the opinion of this Court, it is unimportant whether or not such former judgment is of any such force and effect for the reason that (and the Court so finds) at all times after acquisition of this tract by plaintiffs and until completion of sales of the lots following subdivision, such property was held primarily for sale to customers in the ordinary course of trade or business. No other conclusion can reasonably be drawn from the undisputed evidence. The entire tract was purchased in June, 1947, for $54,000. Mr. Hvidsten borrowed the purchase price, and in order to repay a part of the loan, almost at once sold 182 acres for $42,000. Shortly thereafter (August 12, 1948), he recorded the plat of said subdivision and promptly sold 15 lots along Belmont Road in order to secure the money with which to pay the balance of the loan. Prospective lot purchasers contacted Mr. Hvidsten even prior to the platting. Sales of lots continued each year thereafter, except in 1949; some seven or eight "for sale" signs bearing plaintiffs' telephone number were placed on individual lots; advertisements for sale of lots were placed in the "Grand Forks Herald" two or three times a year over a three-year period; a substantial part of plaintiffs' income was derived from the sale of such lots; the fact that the lots were for sale became well known in the community; and four residences were constructed by Construction, Inc., a corporation controlled by Mr. Hvidsten, the purpose of which was "to increase the sale of the lots" (Tr. p. 49). The sales were not isolated transactions. They were continuing rather than casual. They were frequent and substantial. "All was done with such purpose, system and continuity as well to constitute it a business." Snell v. Commissioner, 5 Cir., 97 F.2d 891, 893, quoted with approval in Brown v. Commissioner, 5 Cir., 143 F.2d 468. As was stated by the Court in Mauldin v. Commissioner, 10 Cir., 195 F.2d 714, 717, "It seems fairly inferable from the record that at all times he had lots for sale, and that the

volume sold depended primarily upon the prevailing economic conditions * * *." "From the cases it would appear that the facts necessary to create the status of one engaged in a 'trade or business' revolve largely around the frequency or continuity of the transactions claimed to result in a business status". Commissioner of Internal Revenue v. Boeing, 9 Cir., 106 F.2d 305, 309, approved and followed in Ehrman v. Commissioner, 9 Cir., 120 F.2d 607. The facts of the instant case meet the "frequency or continuity of transactions" test laid down in the Boeing case, supra. The subdivision of the tract was followed almost immediately by substantial and continuous sales of lots, by active solicitation through advertising, and by various acts on the part of plaintiffs to expedite and increase such sales. The Court concludes that such property was held "primarily for sale to customers in the ordinary course of trade or business".

It is plaintiffs' contention that Congress, in passing Section 1237, did not intend to exclude persons who have subdivided realty, even if they had previously been determined to have held the property primarily for sale to customers, if at the time of such determination they "would have been entitled to make use of the provisions of this section" * * * quoting Senate Report No. 1622 (1954). The statutory clause is "unless such tract at such previous time would have been covered by this section". Plaintiffs contend that, had section 1237 been in effect in 1948, they would have been entitled to make (and could have made) use of the provisions of said section. However, the purpose of said section was not to protect "dealers". Such statute was designed to correct the inequity which then existed as to individuals holding real property for investment who might find that the only way to dispose of such property at a reasonable price was to subdivide it into lots. S.Rep.No. 1622 (1954) In order that such protection inure to the benefit of investors only, and not to dealers, section 1237 imposed a five-year holding period and also provided that it would not apply to anyone who had held such property as a "dealer" at a previous time. As to the latter, however, an exception was provided whereby one who would not have been determined a "dealer" at such previous time had Section 1237 then been in effect, could still have the benefits of said section. It is apparent that the plaintiffs herein could not have qualified in 1948 under section 1237 (had it then been in effect) because they had not then held the property for five years as required by subsection (a) (3). (The property had been acquired by purchase, and not by devise or inheritance.)

"More specifically, the Code itself imposes two conditions relating to 'dealer' activity which, if not satisfied, disqualify a taxpayer from the benefit of these provisions. First, these provisions do not apply to any transaction if the tract involved or any lot thereof had been held by the taxpayer in a prior year primarily for sale in the ordinary course of his business. Application of these provisions is not precluded, however, where such holding in the prior year would have come within the protective scope of these provisions if they had been applicable to the prior year. This condition prevents a taxpayer from qualifying a previously-disqualified parcel or tract of land by seeking to bring it within the instant provisions in a subsequent year." 3B Mertens, Law of Federal Income Taxation, Section 22.148, pp. 686–7.

█ Plaintiffs are, therefore, unable to satisfy the first condition and are, in the Court's opinion, also unable to meet the fourth condition. Subsection (a) (2) of Section 1237 provides in effect that the taxpayer must not have made any "substantial improvement that substantially enhances the lot or parcel sold * * * on such tract while held by the taxpayer". Subsection (a) (2) (A) of Section 1237 provides that any improvement made "by a corporation controlled by the taxpayer" is deemed to have been made by such taxpayer. The evidence establishes that the corporation Construction, Inc., which was controlled

by the taxpayer, built four substantial residences upon certain of the lots in this tract for the purpose of increasing the sale of said lots. The only fair and reasonable conclusion is that such construction was for the purpose of increasing and would and did increase the sale of other lots in the tract by increasing their desirability and marketability from a residential standpoint, which factor would of necessity enhance and affect the market value. It is beyond dispute that such improvements were "substantial" and in the Court's opinion, from the evidence, such improvements "substantially" increased the value of the remaining lots thereafter sold.

Reference is made to the Treasury Regulations, supra, which are, in the Court's opinion, consistent with and reasonably adapted to the enforcement of the statutes here involved. Section 1237 and the applicable Treasury Regulations are discussed in 3B Mertens, Law of Federal Income Taxation, Section 22.149, pp. 688 et seq.

Additional evidentiary facts must be stated in order to fully understand the basis for plaintiffs' contention as to the second issue. Most of the essential, pertinent facts are established by the testimony of the plaintiff Colburn Hvidsten, Jr.

In 1954, plaintiff Colburn Hvidsten, Jr., decided, in order to expedite the sale of lots in the subdivision heretofore described, to construct four houses thereon. He at that time was, and now is, a stockholder, vice president and assistant manager of Northern Construction Company, a concern principally engaged in various types of municipal construction. According to Mr. Hvidsten's testimony, as a matter of personal convenience and in order to keep the house construction operations and records separate from his personal business and records, he decided to incorporate, and consulted a local attorney with that purpose in mind. His attorney thereupon prepared Articles of Incorporation for Construction, Inc., which articles were executed by the plaintiffs herein and

Jean Maude Lyons, a sister of plaintiff Marguerite Hvidsten, on March 29, 1954. The original Articles of Incorporation were duly forwarded to the Secretary of State of this state, together with the statutory incorporation fee in the sum of $25. The Articles were duly filed with the Secretary of State on March 31, 1954, on which date said Secretary issued to the corporation, over the seal of this state, a certificate that the Articles containing the required statement of facts had been filed in his office. The expiration date of the charter granted was March 31, 1974. Thereafter, the annual corporation report was made to the Secretary of State, as required by law, on or about July 31, 1954, and the required annual filing fee of $2.50 paid. The receipt issued by the Secretary of State indicated that said annual report and filing fee were received in his office on August 9, 1954. No subsequent annual report and filing fee was or has been submitted by said corporation.

Subsequent to the issuance of the charter, the incorporators never held a meeting. No stock was subscribed to, issued or paid for. Plaintiffs' attorney had prepared proposed minutes for a meeting to be held on April 2, 1954, but no such meeting was ever held, and the minutes remain unsigned. While a book of stock certificates for Construction, Inc., had been printed, no certificates were ever issued; no meeting was ever held for the purpose of adopting by-laws, and no by-laws were ever adopted.

After the issuance of its charter, Construction, Inc., conducted business operations. These operations were such as were included in the purposes for which the corporation was formed, according to its Articles. The corporation borrowed a substantial amount of money ($40,000) from the First Federal Savings and Loan Association of Grand Forks. The money borrowed represented "construction loans" for the construction of four houses in Hvidsten's Subdivision. The loans were guaranteed by Mr. Hvidsten. The corporation maintained a checking account with the Red River National

Bank of Grand Forks. The only authorized signature for the signing of checks drawn on that account was that of Mr. Hvidsten. Deposit tickets were in the name of the corporation; funds were withdrawn therefrom by checks issued in the name of the corporation. The four houses were eventually constructed, all of the money from the "construction loans" being used for such purpose. Additional monies were furnished by Mr. Hvidsten personally in order to complete construction of said homes. Many of the bills for materials furnished for construction purposes were directed to Construction, Inc.; some were submitted to Mr. Hvidsten personally. All records of Construction, Inc., were maintained and kept by a Mr. Leo Bell under the supervision of Mr. Hvidsten.

The lots on which said four houses were constructed were conveyed by plaintiffs to Construction, Inc., by warranty deed on April 6, 1954.

A Grand Forks realty company, Anderson & Blair, was employed by Mr. Hvidsten to act as real estate brokers in the sale of said houses. Two of the dwellings were sold in 1955; as to each, the purchaser made a down payment and an earnest money receipt was issued by said realtors. An approval of each such sale, entitled "Agreement to Sell" was signed by Construction, Inc., as seller, and which signature was by plaintiff Colburn Hvidsten, Jr. Warranty deeds to the two houses were duly executed by Construction, Inc., on March 31, 1955, and April 6, 1955, respectively. The corporate signature is by Colburn Hvidsten, Jr., as its President, and Marguerite Hvidsten, its Secretary.

On July 31, 1954, an Employer's Application for Identification Number under the Federal Insurance Contributions Act was executed; the employer's name is listed as "Construction, Inc."; it reveals the number of employees as being "5", gives the first date employer paid taxable wages to one or more employees as April 1, 1954, and is signed on behalf of the employer by "Colburn Hvidsten, Jr., Pres.".

On the corporation report submitted to the Secretary of State, executed on July 31, 1954, the question "Is corporation engaged in active business under its charter?" is answered "Yes". The report is executed by Colburn Hvidsten, Jr., as the corporation President, and is under oath.

According to Mr. Hvidsten's testimony, the houses were built by temporary employees of Construction, Inc.—men who had been employed by Northern Construction Company, but who were then temporarily out of work. Mr. Hvidsten testified (Tr. 57) that all of the building of the houses was done by employees of Construction, Inc. A part of the time they were paid from funds of said corporation.

Plaintiffs contend that a net loss of $2,368.74 was sustained on the two houses sold in 1955. There is no evidence to the contrary.

Plaintiffs contend that they are entitled to the benefit of such loss, as individuals, under Section 165 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 165. The basis for this contention is that, while the Articles of Incorporation of Construction, Inc., were actually signed, no further action was taken—that there were no formal organizational meetings, as specifically provided for and required by the statutes of North Dakota, and that in fact the activities conducted under the name of Construction, Inc., were those of the taxpayer plaintiffs. The Government contends that Construction, Inc., was in fact a corporation and was and should be considered a separate tax entity.

Whether or not Construction, Inc., was or was not a corporation must, of course, be determined by the substantive law of the State of North Dakota. Section 10-0208, NDRC 1943, provides as follows:

"Secretary of State to Issue Certificate to Corporation. Upon the filing of the articles of incorporation with the secretary of state, he shall issue to the corporation over the great seal of the state a certificate

that the articles containing the required statement of facts have been filed in his office; and thereupon, the persons signing the articles, and their associates and successors, shall be a body corporate by the name and for the purposes stated in such articles."

It is therefore apparent that Construction. Inc., became a corporation under the laws of North Dakota on March 31, 1954.

The evidence conclusively establishes, as plaintiffs contend, that certain statutory requirements were never met. Section 10–0501, NDRC 1943, provides that "Every corporation formed under this title, within one month after the filing of its articles of incorporation, must adopt a code of by-laws, not inconsistent with the constitution and laws of this state, for its government". This statute was never complied with. It necessarily follows that since no by-laws were adopted, none were certified by a majority of the directors and the secretary, as provided for in Section 10–0506, NDRC 1943. As there were no subscribers to the capital stock, there was no meeting of subscribers, and no election of directors, as required by Section 10–0508 of said code. The Articles did provide that the original incorporators constitute the first board of directors and that they "shall serve until their successors are duly elected and qualified". However, the statutory requirements aforesaid are not conditions precedent, which affect the creation and existence of the corporation, but conditions subsequent only. Certain penalties are prescribed for violation of such statutory requirements.

"Provisions in general incorporation laws, * * * prescribing conditions precedent to corporate existence, must be distinguished from provisions merely prescribing conditions to be complied with after acquiring corporate existence; noncompliance with such a condition subsequent does not affect the existence of the corporation, although it may be ground for a proceeding by the state to forfeit the charter." 18 C.J.S. Corporations § 45, p. 425.

"Under other statutes, however, the corporation comes into existence as soon as proper articles of association or a proper certificate of incorporation or charter is filed in the office or offices designated in the statute * * * and the organization is completed afterward, the statutory provisions as to organization, or as to filing a certificate of organization, being conditions subsequent, a failure to comply with which does not affect the corporate existence unless it is directly attacked in a proceeding by the state." 18 C.J.S. Corporations § 63, p. 448.

Since the trial of this case and pursuant to stipulation of record, plaintiffs have submitted Exhibit 15—a certificate from the Secretary of State certifying that the charter of Construction, Inc., was cancelled November 1, 1955, for failure to file its current annual report for said year, to which certificate are attached copies of notice and letter to Construction, Inc., and copy of advertised list of all corporations whose charters were cancelled as of that date, which notice, letter, and published list were in accordance with the requirements and provisions of Section 10–0527 and 10–0528 of NDRC 1943. Timely objection to the admission of this exhibit has been filed by the defendant.

Section 10–0525, NDRC 1943, requires each corporation organized under the laws of this state to file an annual report, and pay an annual fee in connection with filing such report, in the office of the Secretary of State. This law provides that a failure to do so "shall be prima facie evidence that said company is out of business". Section 10–0527, NDRC 1943, requires the Secretary of State to notify all corporations in default and provides that "Unless such corporation shall file the required report and pay the required fee plus an additional fee of one dollar within sixty days thereafter, the secretary of state shall enter upon the records of his office the cancelation of the

charter of such corporation". Section 10–0529, NDRC 1943, provides for the reinstatement of corporations upon the records of the office of the secretary of state, after cancelation of their charters, upon compliance with certain conditions. Chapter 10–16, NDRC 1943, provides for judicial dissolution, both voluntary and involuntary, of domestic corporations. Section 10–1616, NDRC 1943, prescribes the grounds upon which an action may be brought to annul the existence of a domestic corporation. Under said section, such an action may be brought whenever any such corporation shall have "violated the provisions of any law which prescribes as a penalty for such violation, the forfeiture of the corporate rights, privileges, and franchises of such operation".

Plaintiffs' theory as to this point is plainly and succinctly expressed in their Brief, page 21, as follows: "Of course, the most that can be argued by the government is that Construction, Inc. was a corporation only for the year 1955. Exhibit 15 establishes that the corporate existence, (if there was a corporate existence) was extinguished by the cancellation of the charter in the office of the Secretary of State as of November 1st, 1955. It is, of course, the contention of the plaintiff that the necessary organizational steps required by law following the issuance of charter were never complied with, but in any event the charter was cancelled November 1st, 1955."

■ The admissibility of such a certificate as that represented by Exhibit 15 is discussed by the Supreme Court of North Dakota in the case of Farmers' State Bank of Richardton v. Brown, 52 N.D. 806, 204 N.W. 673, 678. However, the fact sought to be established by such exhibit, that is, the cancelation of the charter of Construction, Inc., on the records of the Secretary of State, is wholly immaterial for the reason that such cancelation, if any, does not ipso facto work a forfeiture of the charter.

"Under this construction, the failure to pay the annual license fee does not, ipso facto, work a forfei-

ture of the corporate charter." Farmers State Bank of Richardton v. Brown, supra, on Petition for Rehearing.

In connection with this point, also see Wells Co. v. Gastonia Co., (Miss.) 198 U.S. 177, 25 S.Ct. 640, 49 L.Ed. 1003, and Mylrea v. Superior & St. C. Ry. Co., 93 Wis. 604, 67 N.W. 1138.

It is therefore clear that under the laws of this state Construction, Inc., was, during all of the times here involved, a corporation created and existing under said laws.

As such corporation it was a separate and distinct tax entity.

"A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages." Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 358, 84 L.Ed. 406.

Without repeating the specific details heretofore stated, the evidence establishes that Construction, Inc., actively and in a substantial manner engaged in the very business for which its charter was issued. The general principle of law is stated as follows:

"The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." Moline Properties v. Commissioner, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499.

A discussion of the general and applicable principles and rules of law may be found in the following decisions: National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779; Given v. Commissioner, 8 Cir., 238 F.2d

579; Watson v. Commissioner, 2 Cir., 124 F.2d 437; Love v. United States, 96 F.Supp. 919, 119 Ct.Cl. 384 and Maletis v. United States, 9 Cir., 200 F.2d 97.

For the reasons hereinbefore stated, judgment will be granted in favor of defendant United States of America. Counsel for said defendant will prepare and submit an appropriate form of judgment in conformity herewith.