The Estate of Bertha Kirschenmann, Deceased, Adolf Kirschenmann, Executor, and Adolf Kirschenmann, Surviving Husband, Individually v. Commissioner.
Estate of Kirschenmann
Docket No. 709-62.
United States Tax Court
T.C. Memo 1965-315; 1965 Tax Ct. Memo LEXIS 15; 24 T.C.M. (CCH) 1759; T.C.M. (RIA) 65315; December 8, 1965
*15 Held: Subdivision lots sold during the years in question were property held for sale to customers in ordinary course of petitioner's real estate business even though the property had been originally acquired and used for many years as a farm. Gain from sales of lots is ordinary income and not long-term capital gain. Further held: Petitioner has failed to show error in respondent's redetermination of allowable depreciation. Merle H. Jenkins, for the petitioner. Edward M. Fox, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following deficiencies in income tax for the calendar years indicated: 1953
$ 6,210.46
1954
468.10
1955
23,547.51
Total
$30,226.07
During the taxable years 1953, 1954, and 1955, Adolf Kirschenmann and *16 Bertha Kirschenmann were husband and wife and filed joint returns. Bertha Kirschenmann died in 1959 and her estate appears as co-petitioner herein with Adolf Kirschenmann. The issues raised by the petition herein are whether petitioners are entitled to capital gain treatment on certain sales of subdivision lots, and whether respondent erred in disallowing a portion of depreciation claimed on certain depreciable assets. The correctness of respondent's adjustment of allowable medical expense deduction is dependent solely upon our resolution of the other disputed issues. Findings of Fact Some of the facts have been stipulated and are found accordingly and incorporated herein by this reference. Adolf Kirschemnann (hereinafter referred to as petitioner) and Bertha Kirschenmann were husband and wife during the years 1953, 1954, and 1955, and they filed joint Federal income tax returns for those years with the district director of internal revenue, Los Angeles, California. Petitioner at the time of trial resided in Shafter, California. Petitioner arrived in Shafter, California, in 1919, at which time he purchased two parcels of land about two miles north of Shafter to be used for *17 farming. The two parcels totaled approximately 280 acres. At some time subsequent petitioner sold 80 acres of this land to his son-in-law. The remaining 200 acres are still owned by petitioner and leased by him to his son who uses this tract for farming. At one time petitioner owned another parcel of approximately 1,250 acres (hereinafter referred to as the Cuyama property) near Cuyama, California. At some date not determinable from the record, petitioner contributed the Cuyama property to a family partnership, referred to herein as K-P Farms, in return for an interest in that partnership. The Cuyama property was used for farming by K-P Farms after acquisition from petitioner. K-P Farms also owned and farmed 350 acres of land near Edison, California, which it had purchased. In 1950 K-P Farms subdivided a portion of the Cuyama property into 186 lots. It sold 22 of those lots in 1951. Subsequently some of the remaining lots were reutilized for farming and some continued to be held for sale, with sales being made as recently as 1963. In 1930 petitioner had purchased an 80-acre farm to the east of, and contiguous with, the then inhabited area of Shafter for a price of $225 per acre. *18 This property is referred to hereinafter as the 1930 farm; it had been used for farming prior to purchase by petitioner, and petitioner continued to use it for farming after he acquired it. In October 1936, petitioner sold approximately 20 acres of the 1930 farm to the Shafter Development Company for $400 per acre. Shafter Development Company was a California corporation organized in September 1936, for the purpose of engaging in the real estate and real estate brokerage business. Petitioner was a director and president, and owned 25 percent of the stock of said corporation. After acquiring the 20 acres Shafter Development Company subdivided and improved the property and held residential lots for sale to customers in the ordinary course of its business. This corporation was liquidated in 1942. From 1919 to 1945, with the exception of his service as an officer and director of Shafter Development Company, farming was petitioner's sole business activity. After the sale in 1936 of 20 acres to Shafter Development Company, petitioner continued to farm the remaining 60 acres of the 1930 farm. However, successful farming became increasingly difficult as a result of gradual diminution of *19 the water supply available to the land. Prior to 1945 petitioner had attempted to sell the whole remaining 60-acre parcel. He wanted to get rid of the property because of the shortage of water and because the land was afficted in spots with nematodes. Because of the water shortage he could not sell it. In 1945 petitioner withdrew from active and direct participation in the business of farming. For a time thereafter his son continued to farm portions of the remaining 60 acres of the 1930 farm, but these efforts were hindered by a steadily worsening water shortage, and parts of the land lay fallow. Petitioner faced the burdens of taxes and weed clearing on the idle land. Throughout the period 1940 to 1960 the City of Shafter grew rapidly - from a population of 1,258 in 1940 to 4,576 in 1960. Petitioner's 60 acres became desirable for residential use and petitioner was approached by several individuals seeking to purchase lots. Because of the natural conditions which made much of the land no longer suitable for farming, the burdensome costs of maintaining the unproductive land, and the presence of a known demand for residential lots, petitioner in 1945 began to subdivide the property. *20 In June 1945, petitioner subdivided approximately 13 of his remaining 60 acres of the 1930 farm into 48 lots. Said subdivision was designated Tract 1261. In June 1947, petitioner subdivided approximately 17 acres of the remaning 47 acres into 66 lots, designated as Tract 1392. In February 1950, he subdivided approximately 10 acres of the remaining 30 acres into 40 lots, designated as Tract 1540. In March 1953, petitioner subdivided approximately 10 acres of his remaining 20 acres into 38 lots, designated as Tract 1649. In April 1953, petitioner subdivided the remaining 10 acres into 36 lots, designated as Tract 1690. During the period, 1945-1953, in which this subdivision activity was proliferating, petitioner's son continued to lease and farm some portions of the decreasing acreage which was not yet subdivided. In connection with each of the abovementioned tracts, petitioner prepared and filed, or caused to be prepared and filed, [1] petitions for annexation of the land to the City of Shafter and to the Shafter Public Utility District. All five tracts were annexed to Shafter pursuant to these petitions. *21 Petitioner caused improvements, such as hard-surfaced roads, curbs, gutters, sewers and water mains to be installed on each of the tracts except Tract 1261. On Tract 1261 the Shafter Public Utility District installed sewers and water mains while petitioner caused the hard-surfaced roads, curbs and gutters to be installed. For each of the five tracts petitioner hired an engineer to survey and lay out the subdivision and to prepare the tract map. Petitioner arranged for such legal details as the creation of public utility easements, the dedication of such easements and of streets to the City of Shafter, and compliance with state law requiring filing of notice with the state, of intent to subdivide real estate for the purpose of sale. Petitioner arranged with various public utilities for the providing of services such as water, electricity, gas, and telephone. Selling prices of lots varied in the different tracts and varied within the same tracts according to size and location. Prices for lots were set by petitioner. Sales of lots were handled through a real estate agent (or agents) on a commission basis. The lots were advertised for sale by signs placed on the property, and they *22 may also have been advertised in a local newspaper by the agents. In 1949 petitioner erected several homes on lots in one of the tracts. Among the reasons for construction of these houses were their use for production of rental income and their use to demonstrate to potential customers the desirability of lots in the rea. Although the real estate agent did the sales work, petitioner had final control over sales and terms thereof. The following schedule shows the tract number, the date each tract was subdivided, the approximate number of acres in each tract, and the number of lots in each tract. It also shows the number of lots from each tract which were sold during the period from 1945 to 1955: Cross
Tract Number
1261
1392
1540
1649
1690
Totals
Date Subdivided
June
June
Feb.
March
April
1945
1947
1950
1953
1953
Number of acres
13
17
10
10
10
60
Number of lots
48
66
40
38
36
228
Sales of lots-years: Prior to 1950
30
31
61
1950
4
4
1951
17
29
3
49
1952
1
23
24
1953
2
14
3
19
1954
18
15
33
1955
17
21
38
48
66
40
38
36
228
In his *23 joint income tax returns for the years in question petitioner stated his occupation as "Farmer." He reported, inter alia, gain from the sales of subdivision lots, rental income, income from K-P Farms partnership, and interest income, including interest received on unpaid purchase prices of lots sold. Petitioner reported gains from sales of subdivision lots as long-term capital gain. Respondent determined that these sales produced ordinary income and not long-term capital gain. In 1951 petitioner and another constructed a commercial building in Shafter. This building was improved in 1953. In 1953 petitioner purchased another commercial building in Shafter. This latter building had been erected in 1946. Petitioner claimed depreciation on these buildings in his returns for each of the years in question, using the straight-line method with a 20-year life for each building. Respondent redetermined depreciation using lives of 40 and 35 years from dates of construction and acquisition, respectively, which petitioner contends were arbitrary. Ultimate Findings of Fact Petitioner was engaged in the real estate business throughout the three years in question, and the lots from Tracts 1392, *24 1540, 1649, and 1690 sold by him during these years were property held by petitioner for sale to customers in the ordinary course of his business. Opinion Whether or not petitioner is entitled to treat the gains realized from the sales of lots from the 1930 farm as capital gains depends upon whether or not the property sold was held by him primarily for sale to customers in the ordinary course of his trade or business. Section 1221, Internal Revenue Code of 1954; section 117(a)(1), Internal Revenue Code of 1939. As has been frequently stated, this ultimate issue is essentially a factual one dependent upon the precise facts of the particular case under consideration. D. L. Phillips, 24 T.C. 435 (1955), acq. 1956-1 C.B. 5. See also Curtis Co., 23 T.C. 740 (1955), and cases cited therein at page 750. We think the facts here clearly indicate that respondent's denial of capital gain treatment was proper. Petitioner's principal business was farming from 1919 until 1945. The property from which the lots here in question were sold was acquired as a farm in 1930, and it continued to be used as a farm at least until 1945 *25 when the first lots were sold. Thus, it is clear that upon acquisition and for 15 years thereafter the property was not held for sale to customers but was held for productive use in petitioner's farming trade. In 1945, largely because of deteriorating natural conditions which were making the land unsuitable for farming, petitioner decided to liquidate his investment in the farm. The fact that sales were made in an unanticipated liquidation of an asset which had been acquired without any intention or purpose to immediately resell has, in the absence of significant factors to the contrary, been a determinative factor in some cases which have approved capital gain treatment. Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955); Austin v. United States, 116 F. Supp. 283 (S.D.Tex., 1953). However, the fact that there was a liquidation of an investment does not assure capital gain treatment. This "liquidation test" has generally been rejected by a recognition that the activity of the taxpayer in disposing of the subject matter could reach the proportions of one doing business regardless of his impelling motives. Thus, in Ehrman v. Commissioner, 120 F. 2d 607 *26 (C.A. 9, 1941), affirming 41 B.T.A. 652 (1940), certiorari denied 314 U.S. 668 (1941), the court stated, at page 610: We fail to see that the reasons behind a person's entering into a business - whether it is to make money or whether it is to liquidate - should be determinative of the question of whether or not the gains resulting from sales are ordinary gains or capital gains. The sole question is - were the taxpayers in the business of subdividing real estate? * * * See also Commissioner v. Boeing, 106 F. 2d 305 (C.A. 9, 1939), certiorari denied 308 U.S. 619 (1939). Beginning in 1945 and continuously thereafter, including the years here in question, petitioner engaged in the real estate business. In 1945 he retired from farming. Although his 1953, 1954, and 1955 tax returns describe his occupation as "Farmer," those returns reveal that all but a very minor portion of gross income came from the following sources related to real estate: Sale of subdivision lots, rental income and interest from vendees of lots. This is a significant indication that petitioner was in the real estate business. Frankenstein v. Commissioner, 272 F. 2d 135, 136 *27 (C.A. 7, 1959), affirming 31 T.C. 431 (1959); Gamble v. Commissioner, 242 F. 2d 586, 591 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. The "liquidation of investment" in petitioner's 1930 farm lasted at least 11 years, from 1945 through 1955. During this period a total of 228 lots were sold, an average of over 20 lots per year. Nineteen lots were sold in 1953, 33 lots in 1954, and 38 lots in 1955. The frequency and continuity of sales clearly indicate in this case that petitioner's method of liquidation constituted the carrying on of a real estate business. Rollingwood Corporation v. Commissioner, 190 F. 2d 263, 266 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court, and cases cited therein at footnote 3. The purpose of the statutory allowance of a lower rate of taxation on the gain derived from the conversion of capital assets is to alleviate the burden which would be incurred by the taxpayer should that gain be classified as ordinary income over a short tax period when in fact it had accrued over a long period of investment, and to remove the deterrent effect of that burden on such conversions. Burnet v. Harmel, 287 U.S. 103, 106 (1932); *28 Boomhower v. United States, 74 F. Supp. 997, 1001 (N.D. Iowa, 1947). Clearly the piecemeal liquidation of an investment over a period lasting more than 10 years does not bear the burden which capital gain treatment was designed to alleviate. Petitioner engaged in extensive activity designed to prepare marketable residential lots for sale. He had the land surveyed and mapped; he had roads, curbs, gutters, sewers, and water mains installed; he arranged for public utility easements and the dedication of streets and easements to the city; he arranged for annexation of the subdivision to the city and to the city public utility district; and he arranged for provision of public utility service to the subdivision. Petitioner also had signs placed on the property and built homes on some lots to be used partially for advertising (i.e., model homes). He may also have advertised in local newspapers. He controlled the selling prices of lots and had the "final say" as to whether or not a sale went through. "All of this was done for gain, and it falls squarely within the concept of the term 'business'." R. J. Richards, 30 B.T.A. 1131, 1136 (1934), affd. 81 F. 2d 369 *29 (C.A. 9, 1936). Petitioner maintains that he remained passive throughout the years of subdivision and sale and that the activity described in our Findings was carried on not by him but by real estate agents and various other agents. Needless to say, this argument is completely without merit. The maxim qui facit per alium facit per se applies; clearly one may carry on a business through agents, representatives or others whom he supervises. Welch v. Solomon, 99 F. 2d 41, 43 (C.A. 9, 1938); Snell v. Commissioner, 97 F. 2d 891 (C.A. 5, 1938), affirming a Memorandum Opinion of this Court. Petitioner points to the fact that he acquired no additional lands during the period of subdivision of the 1930 farm as evidence that he was not engaged in the real estate business. This fact, however, does not prevent his activities from being a business. He merely had enough land to do a large business without buying any more. Snell v. Commissioner, supra. The instant case is strikingly similar in its facts to Oliver v. Commissioner, 138 F. 2d 910 (C.A. 4, 1943), affirming a Memorandum Opinion of this Court. There the taxpayer had for many *30 years engaged in farming on land outside of Washington, D.C. He found that its proximity to Washington gave rise to demand for the property, and, therefore, he caused surveys to be made and had subdivisions laid out. He had streets and other improvements installed. He had platted a total of 548 lots, of which 24, 16, and 40 lots, respectively, were sold during the tax years in question. The taxpayer also erected some houses for rental. His only advertising was by signs placed on the land, and he continued to farm portions of the property for which demand had not developed. Our determination that the taxpayer there was in the real estate business was affirmed on appeal, and the taxpayer was denied capital gain treatment. Petitioner relies on a long list of cases which on their own particular facts have approved capital gain treatment in situations somewhat similar to the instant one. However, petitioner himself states that "[Each] case must rest upon its own facts and circumstances." Viewing the instant case on its own facts and circumstances as revealed by the entire record before us, we conclude that none of the cases cited by petitioner is controlling and that the sales here *31 in question were sales of land held by petitioner primarily for sale in the ordinary course of his real estate business. A second issue in this case is whether respondent erred in disallowing a portion of the depreciation claimed by petitioner on certain improved real estate in Shafter. Petitioner alleges that respondent's redetermination is arbitrary and that petitioner is in a better position to know the useful life of his own buildings. Petitioner has failed to produce any evidence to show that respondent's determination was arbitrary or erroneous. We, therefore, sustain that determination. Decision will be entered for the respondent. Footnotes
1. Some of the activity hereinafter found to have been engaged in by petitioner was actually engaged in by agents of and for petitioner. Since, as discussed infra in our Opinion, the authorized acts of petitioner's agents are as much petitioner's acts as those done by him personally, our Findings of Fact need not detail if and when petitioner operated through an agent in carrying out the activity described.↩