238 F.2d 579
 56-2 USTC P 10,085
 Henry K. GIVEN, Walter C. LaSalle, Transferees, and 801
Walnut Street, Inc., by Henry K. Given and Walter
C. LaSalle, Trustees, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 15422.
 United States Court of Appeals Eighth Circuit.
 Nov. 29, 1956.
 
 Kenneth Cohn, Kansas City, Mo. (Frank L. Cohn and Hall, Bresler & Cohn, Kansas City, Mo., with him on the brief), for petitioners.
 Walter R. Gelles, Atty., Dept. of Justice, Washington, D.C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson, I. Henry Kutz, and Louise Foster, Attys., Dept. of Justice, Washington, D.C., were on the brief), for respondent.
 Before GARDNER, Chief Judge, and JOHNSEN and VAN OOSTERHOUT, Circuit judges.
 JOHNSEN, Circuit Judge.
 
 
 1
 The Tax Court redetermined deficiencies and penalties against 801 Walnut Street, Inc., a dissolved corporation,[1] as to income and excess profits taxes for the years 1945 to 1947, inclusive, and imposed transferee liability upon Henry K. Given and Walter LaSalle therefor, as stockholders and distributees of the corporation. Review is sought on behalf of both the corporation[2] and the transferees.
 
 
 2
 The liability of the corporation was related to rental income and sale profit derived from the LaSalle Building in Kansas City, Missouri. It was the contention of petitioners that the rental income and the sale profit had been received by the corporation simply as agent and conduit for the individuals who were the holders of its stock, and not in its own right, and that the corporation was accordingly without tax liability thereon and hence also there could be no transferee liability.
 
 
 3
 Given was, throughout the time that the corporation had legal existence, the president of it. The corporation became vested with title to the LaSalle Building in 1945, under a deed of conveyance from the vendor to it, in exchange for which it issued a check to and executed a note and mortgage in favor of the vendor. All of this was done pursuant to a resolution of the stockholders of the corporation, authorizing Given as president to purchase the property for the price of $35,000, upon the basis of making a cash payment of $7,000 and giving a note and mortgage for the balance.
 
 
 4
 The capital stock of the corporation consisted of 300 shares, of which 298 stood at the time in Given's name, with a single share having been placed in the name of each of two other persons for qualification purposes. The object of the corporation, as stated in its articles, was 'to acquire, own, manage, lease and mortgage, encumber and sell real estate and personal property * * *.' It had held title to four other pieces of property for a short time and had executed conveyances of them as they severally were sold. All of these properties had been disposed of at the time it acquired title to the LaSalle Building, with the exception of one piece, which also was, however, in the process of being gotten rid of. Given claimed that these properties, just as he contended in relation to the LaSalle Building, had been held by the corporation as mere agent and conduit for himself and other parties. But our concern here is controllingly with the facts as to the LaSalle Building.
 
 
 5
 According to petitioners' evidence, Given had personally dug up the deal on the LaSalle Building and, after negotiating with the owner, had invited the two nominal stockholders of the corporation, together with petitioner LaSalle and another, to go in with him, by putting up $1,750 apiece to take care of the necessary cash payment for the property-- which each of them did. They discussed the matter of how title should be taken and decided that they did not want it standing in themselves personally, for the reason, as stated by Given on the trial, that 'someone might die or have a suit against them' and 'there was too much risk in it'. It was suggested by Given and agreed to by the others that title should be taken by the corporation, and it was following this that the corporation's records showed adoption by the three stockholders of the resolution which had been referred to above. Within two weeks after the conveyance of title from the vendor to the corporation, and with the corporation then having no assets except what had come to it on the basis of the money put into its treasury by the five contributors, Given had a division of the 300 shares of corporate stock made among the contributors, with each of them receiving and accepting a certificate in the amount of 60 shares.
 
 
 6
 On the witness stand, Given attempted to claim that he had merely had the stock reissued from himself to the contributors, as security. Petitioner LaSalle's records, however, showed an entry, evidencing his understanding as a contributor, made at the time and in relation to the money paid by him, of having 'purchased stock from corporation' in the amount of 60 shares. Again, when he and Given bought out the rights of the other three contributors and shareholders, about a year after the building had been acquired, and also about a year before it was resold, LaSalle similarly had entered a notation in his records of having made 'purchase' of 90 additional shares of stock, with the names of the persons being set out from whom the stock was acquired.
 
 
 7
 During the time that the five initial contributors held the stock of the corporation, they all put additional and equal sums into the corporate treasury to enable repairs and improvements to be made on the building, and Given and LaSalle further continued this procedure after they took over the stock of the others. They did not, however, make any payment into the treasury or use the corporation's bank account in connection with their buying out the interests of the other three stockholders.
 
 
 8
 Payment of everything else in relation to the building, except Given's and LaSalle's purchases of the interests of the other shareholders, was made by corporate check. Thus, as noted, the cash portion of the purchase price paid to the vendor at the time of the conveyance was by check of the corporation. All expenditures for repairs and improvements were similarly so paid. The leases of space made, with the service and maintenance obligations which they involved, were in the corporation's name. None of the obligations so entered into were shown to have been made or been accepted by the other contracting parties thereto on the basis that the corporation was in any way acting in the capacity of agent. The rentals collected went into the corporation's bank account in regular course, and were used by it to pay the cost of maintenance and to make additional repairs and improvements on the building.
 
 
 9
 Given tried to claim on the stand that he was handling the matter of operating, repairing, improving and renting the space in the building in his personal capacity and not in his position of president of the corporation. The Tax Court was, however, not required to accept this conclusionary assertion by him as determinative against the fact that the documentary evidence in the situation was not corroborative of it but pointed to the contrary. Thus, as has been mentioned, corporation checks, signed by Given as president, were used to pay for the expenditures made upon the building. And the only written instruments involved-- the leases or rental contracts-- were all entered into by him in the name of the corporation, with liability legally having been assumed by it thereunder not as agent but as principal.
 
 
 10
 There was in all of this such reality and substance of the insulative purpose which corporations ordinarily are intended to serve, of incidents engaged in commercially with third parties as purportedly regular corporate activities and functions, and of obligations and responsibilities being legally incurred by the corporation itself which would not normally be permitted to attend a mere agency or conduit status, so that we would not be warranted in declaring as a matter of law that the Tax Court could not hold that the corporation had a tax liability for the rental income and the sale profit, derived from the property which it legally owned, produced by the activities in which it had engaged, and effected through the obligations into which it had entered as a contracting party.
 
 
 11
 The facts of the situation may again, for emphasis, be briefly reviewed. The five contributors initially associated themselves for the purpose of purchasing, repairing, improving, obtaining tenants for, operating, and ultimately selling for a profit, the then vacant LaSalle Building. They admittedly wanted to avoid in their relationships the complications of possible death, suit or other hazard which might inhere in personal ownership and its necessary incidents. They made payment of the cash, which they were contributing, into the treasury of the corporation, so that the corporation could complete the deal and obtain title to the property. They had the corporation, and not themselves, incur the obligation for the purchase-price balance, through execution of the necessary note and mortgage. They had no instrument drawn up between the corporation and themselves, or even among themselves, establishing or evidencing a trust or agency relationship of any nature. Instead, what they took and held, and all that they ever documentarily had, was the stock of the corporation, whose value or significance was represented entirely by what they had caused to be put into the corporation. They had the corporation make repairs and improvements on the property, paying additional sums into the treasury thereof for this purpose. When two of the five contributors bought out the rights or interests of the other three, the transaction consisted simply of having the three make a transfer to them of the capital stock which they held. The corporation was allowed to enter into rental contracts or leases with the tenants obtained and assume the landlord obligations attendant thereon. All of these incidents extended over a two-year period. And finally, when the property was sold, petitioners Given and LaSalle, the then remaining stockholders and directors of the corporation, by official resolution, authorized the corporation to make the sale and execute the necessary instruments in relation thereto, as constituting legally a transaction entirely on its part.
 
 
 12
 Such a use by a group of individuals of corporate form and structure to insulate themselves against the risk of taking title to property and engaging in the incidents of operating, repairing, improving and obtaining tenants for it-- with the corporation and not the individuals entering into the obligation for the unpaid purchase balance; with the incidents intended to be performed by the corporation being so engaged in by it, including the making of leases in its name and the incurring of the landlord obligations thereof; with these incidents representing business activities of a substantial nature and amount; and with the individuals having entered into no limitative agreement or other instrument with the corporation, or among themselves, evidencing the creation of any other status or relationship or right as to the property than that involved in their capacity of stockholder-- does not afford much of a foundation for claiming agency, conduit, or other 'straw' status on the part of the corporation, as a basis for the escaping of tax liability by it. Cf. Moline Properties, Inc., v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499; National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Barber v. United States, 8 Cir., 215 F.2d 663, 667; Palcar Real Estate Co. v. Commissioner, 8 Cir., 131 F.2d 210.
 
 
 13
 Petitioners undertake to contend that some of the deficiencies assessed by the Commissioner and upheld by the Tax Court were barred by the statute of limitations. No such question was presented by the petitions for redetermination or by any of the other pleadings filed in the Tax Court. Petitioners attempted to inject the contention in the briefs which they submitted after the case had been tried. The Tax Court rejected the contention, saying that it would not consider issues raised for the first time on brief.
 
 
 14
 The Tax Court has, of course, the right to make reasonable rules of pleading and practice for the orderly hearing and determination of cases before it. Its Rule 7(c)(2), 26 U.S.C.A., requires that a petition 'shall be complete in itself so as fully to state the issues.' Where a taxpayer fails to rely upon the statute of limitations in his pleadings or does not otherwise attempt to bring it into the case as an issue until after trial and submission by the parties, the Tax Court may ordinarily regard the question as having legally been waived by him and refuse to consider it. United Business Corporation of America v. Commissioner, 19 B.T.A. 809, affirmed, 2 Cir., 62 F.2d 754, certiorari denied 290 U.S. 635, 54 S.Ct. 53, 78 L.Ed. 552; Kottemann v. Commissioner, 9 Cir., 81 F.2d 621. See also Helvering v. Tetzlaff, 8 Cir., 141 F.2d 8, 11-12. And whatever may be our right, if any, to allow a taxpayer to have the benefit of the statute of limitations in such a situation, as a matter of preventing plain injustice or discrimination in tax administration, the facts of the present situation do not in any event impress us on their face as manifesting any such absolute or probable limitational bar as to prompt our judicial conscience to engage in a technical consideration of it.
 
 
 15
 Petitioners contend that the Tax Court erred in assessing penalties under 26 U.S.C.A., Internal Revenue Code of 1939, § 291. We think that the Court was entitled to find on the circumstances shown that the failure of the corporation to file any return in relation to its ownership, operation and sale of the LaSalle Building, on the basis of the revenues produced thereby, was due to wilful neglect and not to reasonable cause. Thus, among the elements of the situation, it appeared that Given had not told the attorney, who handled his own and the tax affairs of the corporation, anything at all as to the ownership by the corporation of the LaSalle Building and its receipt of rentals therefrom, either in relation to the possible tax liability of the corporation or of himself. His explanation, that the reason he did not do so was because more money was being spent in repairs and improvements on the building than was being received in rentals from it, was hardly required to be accepted as sufficiently excusive, in respect to penalty purpose, particularly since he admittedly did not recognize any distinction between ordinary and capital outlays in the deductibility of the expenses which he claimed had existed.
 
 
 16
 It is contended that the Tax Court erred in its determination of the amounts of rental income received from the LaSalle Building, in that these amounts did not correspond with the alleged records of the corporation which he produced. Given had originally refused, when the tax investigation began, to provide the revenue agent with the books and records of the corporation. The revenue agent then endeavored to get at the facts from outside sources. Later, after Given had engaged an accountant to represent himself and the corporation in the matter, the accountant gave the revenue agent access to the purported records which Given had kept of the operation of the building. The accountant and the revenue agent analyzed the data which Given had produced and determined the amount of income tax liability which would be due on the basis thereof. The revenue agent had, however, obtained other information also, to which he adjusted the tax liability. The Tax Court cannot be said to have had no right to accept this determination on the basis of the revenue agent's testimony.
 
 
 17
 A final contention is made that the Court erred in holding Given and LaSalle liable as transferees. The matter of the Tax Court's refusal to consider the question of the statute of limitations has previously been discussed. With that question not requiring consideration here, there is no basis for Given and LaSalle to contend that transferee liability could not properly be imposed upon them, in view of the fact that as sole stockholders distribution was made to them of all the corporation's assets; that the corporation became thereby wholly insolvent and thereafter ceased to do business and to exist; and that the amount which each of them received on such distribution was in excess of the amount of the corporation's tax liability. See 26 U.S.C.A., Internal Revenue Code of 1939, § 311(f); 9 Mertens Law of Federal Income Taxation § 53.10.
 
 
 18
 Affirmed.
 
 
 
 [1]
 The corporation had been dissolved by operation of Missouri law
 
 
 [2]
 The representatives of the corporation here are its statutory trustees