John N. Gounaris v. Commissioner.
Gounaris v. Commissioner
Docket Nos. 89401, 93254, 3188-62.
United States Tax Court
T.C. Memo 1963-145; 1963 Tax Ct. Memo LEXIS 199; 22 T.C.M. (CCH) 686; T.C.M. (RIA) 63145; May 27, 1963
*199 Held: (1) Petitioner did not file false or fraudulent returns with intent to evade tax for the calendar years 1946 through 1955. (2) Since the statute of limitations for the calendar year 1955 was not specifically pleaded and was raised for the first time by petitioner in his brief, that issue is not before us. Given v. Commissioner, 238 F. 2d 579 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court, followed. (3) Taxable income for calendar year 1955 determined. Montgomery Knight, Jr., 550 Law Bldg., Norfolk, Va., and Joseph V. Anderson for the petitioner. W. Ralph Musgrove for the respondent. ARUNDELL
*200 Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings the respondent determined deficiencies in income tax and additions to the tax for the calendar years 1946 through 1955 and for the calendar year 1957 in amounts as follows: Additions to the Tax Under Section
Docket
293(b)
6653(b)
294(d)(1)(A)
Year
Number
Deficiency
1939 I.R.C.
1954 I.R.C.
1939 I.R.C.
1946
3188-62
$1,211.97
$ 605.99
$100.80
1947
3188-62
1,449.80
724.90
112.07
1948
3188-62
679.79
339.90
48.92
1949
3188-62
1,757.28
878.64
151.78
1950
3188-62
831.07
415.54
76.57
1951
3188-62
1,210.64
605.32
110.30
1952
3188-62
2,203.47
1,101.74
280.19
1953
3188-62
4,564.27
2,282.14
485.31
1954
93254
5,168.04
$2,584.02
543.16
1955
89401
7,159.93
3,579.97
1957
93254
1,130.87
565.44
Respondent has correctly stated the issues in his brief thus: 1. Whether the use of the net worth method of computing petitioner's adjusted gross income was justified and the computation of the adjusted gross income was correctly made by respondent for the years 1946 through 1955 and 1957. *201 2. Whether petitioner is liable for the 50 per cent additions to the income tax under section 293(b), Internal Revenue Code of 1939, and section 6653(b), Internal Revenue Code of 1954, for the taxable years 1946 through 1955 and 1957. 3. Whether the statute of limitations bars the assessment and collection of the deficiencies in tax and the additions to the tax for the years 1946 through 1954. 4. Whether petitioner is liable for the additions to the income tax under section 294(d)(1)(A), Internal Revenue Code of 1939, for the taxable years 1946 through 1954. In Docket No. 93254 respondent raised an issue as to whether the 6-year statute of limitations, under section 6501(e), I.R.C. of 1954, was applicable to 1954, alleging that petitioner omitted from gross income for the year an amount properly includable therein in excess of 25 percent of the gross income reported. In his brief "Respondent now concedes this issue." Respondent also concedes that absent fraud the statute has run for all the years 1946 through 1953. In Docket No. 93254, relating to the year 1957, the respondent determined that petitioner had unreported income *202 for that year of $4,412.68. In his answer, respondent reduced this figure to $1,572.03. Petitioner, without conceding the correctness of this reduction, decided to pay the resulting deficiency, plus the addition for fraud, rather than to incur the expense necessary to contest the matter further. We will, therefore, make no findings as to the year 1957. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner is an individual with residence in Portsmouth, Virginia. He filed individual income tax returns with the collector and district director of internal revenue at Richmond, Virginia, for the taxable years 1946 through 1955. Petitioner was born in Andros, Greece, in 1903. He received the equivalent of a fifth grade education in Greece. In 1922 petitioner was a sailor aboard a ship docked in New York harbor. He "jumped ship" and sought employment in New York. At the time petitioner "jumped ship" he had about $500. Petitioner's first employment was on a river dredge. After approximately 6 months he left this employment and began work as a dishwasher in a restaurant. He later became a cook in a large New York chain of restaurants, *203 in which employment he remained for approximately 20 years. The name of the restaurant where petitioner worked was called Tiptoe Inn. While there he worked his way up from a cook to head of the kitchen at a salary of about $75 a week. He would work double shifts, take the place of other cooks, and during his time off would also work as a waiter at numerous parties. He lived frugally, spent almost nothing for recreation and very little for clothing. He did not gamble or drink intoxicating beverages. He generally walked to work. When petitioner first came to New York in about 1922 he lived in the Bowery and paid $1 a week for his room. Later, he and about five other men shared a 5-room apartment, with no heat or hot water, for a total monthly rent of $18. Petitioner's share was $3. About 1929 petitioner rented a room at the home of an aunt, Ann Gounaris. The most he ever paid his aunt for his room was $8 a week. In 1942 petitioner left New York and went to Portsmouth, Virginia, to become a partner in a restaurant business known as the Puritan Restaurant where he also worked as a cook. At the time petitioner went to Portsmouth he had approximately $15,000 in cash. Petitioner invested *204 approximately $3,500 in the Puritan Restaurant business for a one-third interest in the partnership. He engaged in this business until it was destroyed by fire on August 12, 1946, the first year of the taxable period here involved. At the Puritan, the partners each drew $75 a week and split the profits three ways. Petitioner deposited most of his receipts from Puritan in the Merchants & Farmers Bank of Portsmouth. During the period 1946 through 1955 petitioner was engaged in various capacities in the restaurant business. After the fire in the Puritan Restaurant, petitioner went to work as a cook at a restaurant operated by one Harry Kolantis. After approximately 3 years of this employment petitioner went to work as a cook for Harry's brother, Paul Kolantis. He worked for Paul for approximately 1 1/2 to 2 years and then left this employment to go into business as a partner with Garland H. Moore. Thereafter, during the remainder of the taxable years in question petitioner owned and operated restaurants in partnership with Moore. From 1942 through 1955 petitioner has lived in a room at Portsmouth and has never paid more than $10 a week rental. On April 14, 1952, petitioner and Moore, *205 as parties of the second part, entered into a written agreement with Willard C. Meiggs and Woodrow W. Culpepper, parties of the first part, and Harry Lee Culpepper, Jr., party of the third part, wherein the parties of the first part sold to the parties of the second part the stock of merchandise and the furniture and fixtures of a business known as the Dixie Barbecue for a consideration of $16,765.65 and the assumption by the second parties of the balance due on certain fixtures of $3,234.35, making the total consideration $20,000. Goodwill was not mentioned in the agreement and nothing was paid for goodwill. The last paragraph of the agreement provided: The said Harry Lee Culpepper, Jr., the party of the third part, having an interest in the name of Dixie Barbecue, doth grant to the parties of the second part the exclusive right to the use of said name and agrees that during the term of this agreement he will not in any manner or form whatsoever use the name of Dixie or Dixie Barbecue. The Dixie Barbecue had been established as a restaurant business in 1946. Prior to the acquisition of the business by petitioner and Moore, the restaurant had specialized in Smithfield ham and barbecue *206 sandwiches, light meals, and soft drinks. After petitioner and Moore acquired the business they added more meals to the menu. Approximately one year after the acquisition of the Dixie Barbecue petitioner and Moore, in July 1953, opened a second restaurant business in Portsmouth, Virginia, known as the Dixie Drive-In. This business was also operated by them throughout the remainder of the taxable years here in question. Petitioner and Moore engaged the services of one E. C. Beacham, a public bookkeeper and accountant, to keep the books of the partnership, consisting of the two restaurants, the Dixie Barbecue and the Dixie Drive-In. All the invoices for purchases and for expenses were placed in a box which Beacham would pick up at certain intervals and record in large multicolumn books. The cash sales were first recorded on cash register tapes. At the end of each day's business, which would be early the following morning, Moore would take the cash register tapes, count the cash, leave enough cash for change and for bills, record the cash sales in a black journal which he himself kept, after which he would destroy the cash register tapes, thinking he had no further use for them. At *207 the end of each month Moore would add the daily sales from each restaurant from his black journal and keep an adding machine tape of the result. At the end of the year he would add sales for the 12 months and give the result to Beacham who would then enter into the multicolumn books a debit to cash and a credit to sales for all the sales made during the year. Beacham would then prepare the partnership returns from the data contained in the multicolumn books, secure from petitioner information pertaining to petitioner's other personal income, such as dividends and interest and personal deductions, if any, and then prepare for petitioner his individual returns. On his returns for the years 1946 through 1955, petitioner reported wages, other income, losses, partnership income and resulting adjusted gross income as follows: Partnership
Adjusted Gross
Year
Wages
Other Income
Losses
Income
Income
1946
$ 906.75
$525.00
$1,431.75
1947
3,887.00
$1,373.33
2,513.67
1948
3,302.00
100.00
1,000.00
2,402.00
1949
3,302.00
600.13
2,701.87
1950
3,150.30
3,150.30
1951
2,542.60
200.00
2,742.60
1952
650.00
700.00
$5,074.80
6,424.80
1953
4,629.73
4,629.73
1954
4,443.54
4,443.54
1955
100.00
4,980.64
5,080.64
*208 On the partnership returns for the years 1952 through 1955 the following summary of information was reported: Item
Year 1952
Year 1953
Year 1954
Year 1955
Gross Sales
$61,151.84
$104,873.80
$150,369.89
$162,811.70
Less Cost of Goods Sold: Beginning inventory
621.84
615.97
1,473.47
1,470.76
Merchandise purchased
33,854.10
61,967.81
84,843.74
96,249.32
Cost of labor, etc.
2,359.07
Total
$36,835.01
$ 62,583.78
$ 86,317.21
$ 97,720.08
Ending inventory
615.97
1,473.47
1,470.76
2,656.00
Cost of Goods Sold:
$36,219.04
$ 61,110.31
$ 84,846.45
$ 95,064.08
Gross Profit
24,932.80
43,763.49
65,523.44
67,747.62
Deductions
14,783.19
34,504.04
56,636.36
57,786.34
Net Income
$10,149.61
$ 9,259.45
$ 8,887.08
$ 9,961.28
50% to each partner
$ 5,074.80
$ 4,629.73
$ 4,443.54
$ 4,980.64
Percentage of Gross Profit to
40.77%
41.73%
43.57%
41.61%
Sales
The percentage of gross profit to sales of Meiggs and Culpepper, the prior owners of Dixie Barbecue, was 36.7 percent for 1949; 32.3 percent for 1950; and 37.9 percent for 1951. During the years 1946 through 1955 petitioner received interest income of the following *209 amounts: Interest
Interest
Year
Income
Year
Income
1946
$ 82.78
1951
$686.67
1947
112.21
1952
822.62
1948
207.01
1953
797.49
1949
409.46
1954
768.89
1950
519.68
1955
566.31
During the years 1952 through 1955 petitioner received dividend income of the following amounts: Capital Gain
Year
Dividends
Dividends
1952
$ 0.50
1953
$ 83.60
13.94
1954
144.21
85.73
1955
822.02
170.82
When respondent's agents commenced the audit of petitioner's income tax returns and the partnership businesses, they were furnished with all the books kept by Beacham and, in addition, the agents were also given several boxes containing bundles of invoices, receipts and pay-out slips. Moore thought the black journal and the monthly adding machine tapes were in the boxes delivered to the agents, as they have not been able to locate the black journal or any of the adding machine tapes except the tapes for the calendar year 1953 covering the cash receipts for the Dixie Barbecue for that year. These tapes for 1953 show cash receipts of $73,461.80 which agrees exactly with a schedule attached to the partnership return for that *210 year showing cash receipts as follows: From Dixie Barbecue
$ 73,461.80
From Dixie Drive-In
31,412.00
Total
$104,873.80
Respondent determined that petitioner's correct income could not be determined from the books and records kept by petitioner and for the partnership, and instead determined petitioner's income for the years 1946 through 1955 by a so-called net worth statement. This statement showed the assets and liabilities of petitioner as of the close of the years 1945 through 1955 as determined by the respondent. He determined that the difference between the assets and liabilities represented petitioner's "net worth" for the particular year and that the increase in net worth for any year represented the difference between the net worth for such year and the net worth for the immediately preceding year. To this "increase in net worth" the respondent added an estimated amount for petitioner's living expenses and the Federal income taxes he had paid, plus and minus a few minor items for capital gains and losses and dividend exclusion for 2 years of $50 each. The result was what the respondent called "Adjusted Gross Income as Corrected" which he compared with *211 the "Adjusted Gross Income" reported by petitioner and shown previously herein. The respondent further determined that the difference between the adjusted gross income as corrected and that reported by petitioner represented an understatement of adjusted gross income upon which petitioner was taxable and that, because this understatement was relatively large, petitioner had filed false and fraudulent returns for the years 1946 through 1955. A brief summary of this net worth statement is as follows: Increase
Net Worth
in Net
Year
Total Assets
Worth over
Add
Add Net of
Ending
less Total
Previous
Living
Other Ad-
Dec. 31
Liabilities
Year
Expenses
justments
1945
$ 28,959.93
1946
32,017.35
$ 3,057.42
$4,000
$ 618.59
1947
37,064.90
5,047.55
4,000
14,94
1948
39,471.61
2,406.71
4,000
(7.99)
1949
46,260.48
6,788.87
4,000
40.80
1950
49,093.94
2,833.46
4,500
93.60
1951
52,567.83
3,473.89
4,500
139.60
1952
60,257.31
7,689.48
5,000
37.00
1953
70,170.42
9,913.11
5,000
1,887.40
1954
85,355.77
15,185.35
3,000
760.58
1955
$104,271.15
$18,915.38
$3,000
$1,038.83
Total
understatement
determined by
respondent
*212 Adjusted
Adjusted
Understate-
Year
Gross
Gross
ment of
Ending
Income as
Income
Adjusted
Dec. 31
Corrected
Reported
Gross Income
1945
1946
$ 7,676.01
$1,431.75
$ 6,244.26
1947
9,062.49
2,513.67
6,548.82
1948
6,398.72
2,402.00
3,996.72
1949
10,829.67
2,701.87
8,127.80
1950
7,427.06
3,150.30
4,276.76
1951
8,113.49
2,742.60
5,370.89
1952
12,726.48
6,424.80
6,301.68
1953
16,800.51
4,629.73
12,170.78
1954
18,945.93
4,443.54
14,502.39
1955
$22,954.21
$5,080.64
$17,873.57
Total
$85,413.67
understatement
determined by
respondent
In determining the opening net worth on December 31, 1945, of $28,959.93, the respondent did not determine that petitioner had any cash on hand at that time, whereas petitioner had at least an amount of $15,000 of cash at that time. Also, the respondent determined that petitioner's balance in the Merchants & Farmers Bank was an estimated amount of $2,000, whereas petitioner had on deposit in that bank on December 31, 1945, an amount of between $16,000 and $18,000. Petitioner's living expenses for the years 1946 through 1955 did not average over $100 per month for the first 4 *213 years and not over $140 per month for the last 6 years. Petitioner's one luxury was automobiles. He acquired a low-priced car in 1949 and approximately every year thereafter he would trade the car he had for a higher priced car. He drove his cars very little. After the Puritan Restaurant burned in 1946 petitioner's share of the fire insurance received was approximately a little over $2,000. During the times petitioner waited on tables from 1946 through a part of 1952 he received tips averaging from $2 to $5 a day. He considered these tips as gifts and did not report them as income. He received no tips during the years 1953 through 1955. During the taxable years in question, petitioner owned a farm at Penns Grove, New Jersey, about 75 miles from New York City. He acquired this farm around 1930 or 1931 at a cost of $15,900. His commonlaw wife, who was one of the waitresses at Tiptoe Inn, persuaded petitioner to buy the farm so she and her father would have a place to live. Petitioner did not live on the farm. Neither did he claim any business expenses in connection with the farm. He did not receive any income therefrom except on one occasion in 1941 when he picked and sold some *214 peaches from the farm. In 1946 he spent $3,000 for improvements on the farm. Petitioner's total income for the years 1922 through 1945 (prior to the taxable years here involved) was approximately $126,000. During this same period his cost of living approximated $14,500. Petitioner never received any gifts or inheritances prior to or during the taxable years here involved. His only source of income was from the restaurants with which he was associated and the interest and dividends herein mentioned. No part of the deficiencies for the years 1946 through 1953 was due to fraud with intent to evade tax. No part of the underpayments determined by the respondent for the years 1954 and 1955 was due to fraud. The deficiencies determined for the years 1946 through 1954 are barred by the statute of limitations. Opinion The principal issue in this case is whether, under section 293(b)[1] of the 1939 Code and section 6653(b)[2] of the 1954 Code, any part of the deficiencies determined by the respondent was due to fraud. After careful consideration of the entire record, we have found as an ultimate fact that there was no fraud. *215 The record is clear that petitioner's only source of income during the taxable years in question was from the various restaurants with which he was associated and some interest and dividends. The respondent's counsel as well as the Government witnesses admitted they could find no other source of income. The income from interest and dividends was relatively small and, while some of this income was omitted from the returns, we find no evidence to support a finding that the omission was intentional. Therefore, if petitioner has grossly understated his income during those years, it would seem to be in connection with the various restaurants. Prior to his entry into the partnership with Moore in the fall of 1952, petitioner received some tips which he regarded as gratuities and did not report as income. Of course, this was a mistake but we do not think the omission was due to fraud. All of his other income from these restaurants would appear to have been substantially reported. This then brings us to the Dixie Barbecue and Dixie Drive-In for the years 1953 through 1955 which are the years wherein the respondent has determined the largest alleged understatements. Petitioner and Moore *216 bought the Dixie Barbecue business as a going concern from Meiggs and Culpepper. About 6 months later they opened the Dixie Drive-In. Beacham kept a set of multicolumn books for those businesses wherein he recorded all the purchases and expenses in connection with those businesses and at the end of the year recorded the total sales which were given to him in a single figure, by Moore. The respondent does not seriously question the correctness of the purchases and expenses, and we are satisfied that Beacham recorded them as accurately as could be done. In fact, the parties have stipulated the opening and closing inventories used by Beacham, except the beginning and ending inventory for part of the year 1952. The respondent does seriously question the correctness of the sales. Moore testified how he personally checked the cash each day from the cash register tapes and personally recorded the sales for each day in a small black journal, after which he would destroy the cash register tapes. At the close of each month he would add the daily sales on an adding machine and keep the tape. Then, at the end of the year he would add the monthly sales on an adding machine and give the total *217 for the year to Beacham who would then enter the total sales in the multicolumn books and prepare the partnership information returns and petitioner's individual returns. Unfortunately, the black journal and all the adding machine tapes (except the ones for the Dixie Barbecue for the year 1953) could not be located at the hearing. However, the ones for the Dixie Barbecue corresponded exactly with the information reported on the partnership return for 1953. The respondent would have us believe that the sales were not correctly recorded by Moore and largely based on this assumption he has resorted to the net worth method. After a careful study of the record, we do not think respondent has sustained his burden of proving the sales were understated, at least fraudulently understated. When Meiggs and Culpepper ran the Dixie Barbecue the percentage of gross profit to sales was 36.7 percent for 1949, 32.3 percent for 1950, and 37.9 percent for 1951. Based on the sales given by Moore to Beacham, the percentage of gross profit to sales of the Dixie Barbecue and Dixie Drive-In was 40.8 percent for 1952, 41.7 percent for 1953, 43.6 percent for 1954, and 41.6 percent for 1955. In other words, *218 petitioner and Moore did better than Meiggs and Culpepper whose reports were not questioned for accuracy. And when it is assumed, as we think it should be, that the cost of goods sold by petitioner and Moore was accurately reported, we think it is a fair test of the accurateness of the sales to compare the percentage of gross profit with sales of the business done by petitioner and Moore with that done by their predecessors who, it is conceded, correctly reported the income. And, when such comparison shows that petitioner and Moore did better than their predecessors, we think it is reasonable to conclude that the sales reported by petitioner and Moore were substantially correct. Nevertheless, the respondent determined that the records kept by petitioner and the partnership did not accurately reflect income and proceeded to determine petitioner's income by means of a net worth statement of petitioner's assets and liabilities, to which he made certain adjustments, mainly for living expenses. We have set out in our findings a summary of this statement which, if respondent were correct, shows that petitioner understated his income for the years 1946 through 1955 by $85,413.67. Some of *219 the figures used in this statement were stipulated and, if only the stipulated figures were used, the socalled understatement would be reduced to $27,039.82 instead of $85,413.67. It is extremely important in these net worth statements that the opening net worth at the beginning of the period under review be correctly determined. Otherwise, the entire statement is inaccurate. See Holland v. United States, 348 U.S. 121, wherein the Supreme Court said: We agree with petitioners that an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * * In the instant case the respondent showed the opening net worth to be $28,959.93, consisting of: Merchants & Farmers Bank, check-
ing
$ 2,000.00
Union Dime Savings Bank, savings
3,813.94 *
Farm at Penns Grove, New Jersey
15,000.00 *
Equity in Puritan Restaurant
8,145.99 *
Total assets
$28,959.93
Liabilities
None
Net worth at December 31, 1945
$28,959.93
*220 The above opening net worth of $28,959.93 determined by the respondent was grossly understated. In addition to the three above stipulated amounts totaling $26,959.93 petitioner testified and we have found as a fact that he had $15,000 of cash and between $16,000 and $18,000 in the Merchants & Farmers Bank. The $2,000 determined by the respondent was purely an estimate. The bank's records had been destroyed prior to December 31, 1952, so no verification could be had at the bank. We believe there is substance to petitioner's testimony for, when additional assets were acquired after 1945 and during the years 1946 through 1955, there is considerable testimony that such assets were acquired either with cash having a moth ball odor or with a check from the Merchants & Farmers Bank. Also, petitioner's accountant attempted a reconstruction of petitioner's total income and living expenses for the 24 years prior to 1946. This reconstruction showed a total income for the period 1922 through 1945 of approximately $126,000 and total living expenses of approximately $14,500. From this it is not unreasonable to believe that on December 31, 1945, petitioner had from $29,000 *221 to $31,000 more than the $28,959.93 used by the respondent as the opening net worth, and indeed it could well have been more. In addition to the grossly understated opening net worth, there are other determinations by the respondent in the net worth statement that are open to serious question. For instance, petitioner's capital account in the partnership with Moore has been overstated by the respondent. Paragraph 55 of the stipulation is as follows: Attached hereto as exhibit 29 is a statement of assets, liabilities and net worth and the equities of the partners covering the years ended December 31, 1952, through 1957. Those amounts as to which the parties are in agreement are shown on the statement. The amounts as to which the parties cannot agree are left blank. The respondent attempted to supply the amounts that were left blank, which were the amounts as to which the parties could not agree. On the assets side of Exhibit 29 (referred to in paragraph 55 of the stipulation above quoted), the amounts as to which the parties could not agree were for alleged goodwill and depreciable assets, and on the liability side the amounts were for reserve for depreciation and amounts due *222 other creditors. The evidence offered by the respondent was insufficient to supply these amounts, the effect of which is to further discredit the net worth statement. Another determination by the respondent in the net worth statement that is open to serious question is living expenses. These adjustments, we think, were much too high when the frugal manner in which petitioner lived is taken into consideration. During the period from 1946 through 1952 the respondent has determined that petitioner understated his income by $39,866.93 and more than doubled his net worth (from $28,959.93 to $52,567.83). During most of this period petitioner was employed as a cook in various restaurants, and the accountants he employed to prepare his returns reported his earnings as a cook and attached to the returns the W-2 withholding statements showing such earnings. In his reply brief, petitioner very aptly states: The question then arises, how does the government explain the increase in net worth from December 31, 1945, to December 31, 1952, which almost doubles, if the primary source of income which was received by Mr. Gounaris was income which was subject to withholding, and which Mr. Gounaris *223 received as an employee? This is an enigma which is insoluble. It is insoluble when the government attempts to argue that this additional sum was taxable income and not investments and savings already on hand. Respondent's whole case of fraud is grounded on the alleged accuracy of his net worth statement. When we take into consideration the fact that apparently petitioner's only source of income during the years 1946 through 1955 was from interest and dividends and restaurants; that his income from interest and dividends was relatively small; and that his income reported from restaurants was substantially correct, we cannot give much faith to a net worth statement that opens with a grossly understated net worth and other determinations therein which are open to serious question. All in all, we do not think the respondent has sustained his burden of proving fraud by clear and convincing evidence. We hold that no part of the deficiencies here in question was due to fraud with intent to evade tax, and that the deficiencies for the years 1946 through 1954 are barred by the statute of limitations. That leaves only the year 1955 for further consideration. Petitioner contends that the *224 3-year period for assessment of the 1955 tax under section 6501(a), I.R.C. 1954, expired before the respondent mailed his notice of deficiency on June 18, 1960; and that respondent has failed to sustain his burden ( C.A. Reis, 1 T.C. 9, Elvina Ratto, 20 T.C. 785) that under section 6501(e), I.R.C. 1954, he had within 6 years after the return was filed to make the assessment. We hold against petitioner on this issue for the reason that the statute of limitations for the calendar year 1955 was not specifically pleaded and was raised for the first time in his brief, and the issue is therefore not before us. Given v. Commissioner, 238 F. 2d 579 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. For the calendar year 1955 petitioner reported adjusted gross income of $5,080.64 which consisted of income from the partnership of himself and Moore of $4,980.64 and a dividend from General Material of $150, less a dividend exclusion of $50. The respondent determined that under the net worth method petitioner had unreported income of $17,873.57. The evidence shows that during 1955 petitioner received *225 dividend income of $822.02, capital gain dividends of $170.82, and interest income of $566.31. The only other known source of income during 1955 was from the partnership with Moore. Under the fraud issue we have already considerably discredited the net worth statement. The three principal items which cause the increase in net worth in 1955 of $18,915.38 over the previous year are three investments which petitioner made in 1955 in securities purchased from Consolidated Investment Services, owned and operated by one Nicholas Kostopulos. These three investments, as shown on the net worth statement as of December 31, 1954, and December 31, 1955, are as follows: Securities
12/31/54
12/31/55
Increase
Mass. Investors
Trust
$ 489.65
$ 4,014.82
$ 3,525.17
Gen. Motors &
Miscl. Ins. Cos.
0
11,268.31
11,268.31
Fundamental In-
vestors, Inc.
4,508.68
12,807.30
8,298.62
Total increases over previous year
$23,092.10
(Note: There were also decreases over the previous year of $5,000 in Mutual Federal Savings and Loan Association and $2,358.81 in Norfolk Federal Savings and Loan Assn.) Kostopulos testified at great length as to how petitioner purchased *226 these securities from him and paid for them mostly in cash of large denominations, principally in one hundred dollar bills with a moth ball odor. Among other things, Kostopulos said: Well, of course, in practically all instances he did pay for them with cash, and I would not forget that, because they did smell mothbally. l As a matter of fact, I remember at the time we had our account at the Bank of Virginia, and even the teller of the bank would comment about the money smelling like mothballs * * *
We think petitioner has sustained his burden of proof that he did not realize the income in 1955 that the respondent determined. We hold the respondent erred in determining petitioner's income for 1955 by means of the net worth method. We think petitioner has shown that his adjusted gross income for 1955 should include only $4,980.64 of partnership income and the previously mentioned amounts for dividends and interest. The deficiency for 1955 should be redetermined accordingly. Decisions will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2). ↩
2. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).↩
*. So stipulated.↩