Joseph Rothafel and Dorothy Rothafel v. Commissioner. Estate of Joseph Diamond, Deceased, Abraham Diamond, Executor, and Anna Diamond v. Commissioner.
Rothafel v. Commissioner
Docket Nos. 2421-62, 2448-62.
United States Tax Court
T.C. Memo 1965-277; 1965 Tax Ct. Memo LEXIS 54; 24 T.C.M. (CCH) 1524; T.C.M. (RIA) 65277; October 19, 1965
*54 A corporation owned equally by petitioner-husbands controlled the right, as lessor of a certain well-located service station, to designate the brand of gasoline and related products to be sold exclusively at the leased service station. Held: Receipt by the petitioner-husbands of the proceeds of the sale by the corporation of the right to designate the exclusive supplier constituted ordinary income to them as a dividend distribution from the corporation. David W. Bernstein, 135 Broadway, New York, N. Y., for the petitioners. John E. McDermott, Jr. and Donald H. Cuozzo, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in income tax for the year 1958 against petitioners Joseph and Dorothy Rothafel in the amount of $3,851.24, and against *55 Joseph and Anna Diamond in the amount of $2,180.53. Following the death of Joseph Diamond, the Estate of Joseph Diamond, Deceased, was substituted in place of Joseph Diamond as co-petitioner with Anna Diamond in Docket No. 2448-62. The petitioners in Docket No. 2421-62 have conceded a disallowance of $1,000 in expenditures. Thus, the only issue remaining for decision in both dockets is whether the proceeds received by Joseph Diamond and Joseph Rothafel from the sale by their corporation for a lump sum of the right to designate the oil company from which a certain well-located service station would be obliged to obtain all its supplies are taxable as ordinary income or as capital gain to them individually. Findings of Fact Certain documents have been stipulated into evidence by the parties. The Stipulation of Facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Joseph Rothafel and Dorothy Rothafel are husband and wife residing in Belle Harbor, New York. They filed their 1958 joint Federal income tax return with the district director in Brooklyn, New York. Joseph Diamond, now deceased, and Anna Diamond were husband and wife residing in Bronx, *56 New York, during the year 1958. They filed a joint Federal income tax return for that year with the district director, New York, New York. Joseph Diamond and Joseph Rothafel also filed a partnership income tax return for the calendar year 1958. Petitioners Dorothy Rothafel and Anna Diamond are petitioners herein solely by reason of having filed joint returns with their husbands for 1958. Hereinafter Joseph Rothafel will be referred to as Rothafel and Joseph Diamond will be referred to as Diamond. At all times here pertinent, Diamond and Rothafel each owned 50 percent of the stock of Winthrop Service Center, Inc., (hereinafter referred to as "Winthrop"), a New York corporation. Winthrop was organized in 1936, was still in existence in 1958 and as of the date of trial of this case. At all times here pertinent its principal place of business was in Brooklyn, New York. A number of years prior to 1952, probably during the 1930s, Winthrop acquired title to real estate located at Utica Avenue and Winthrop Street in Brooklyn (hereinafter sometimes referred to as "the Utica Avenue property"). Subsequent to this acquisition and prior to 1952 a gasoline station was built on the property. *57 On January 1, 1952, Winthrop entered into a lease agreement with A. A. Bros. Service Station, Inc., (hereinafter referred to as A. A. Bros.), under which A. A. Bros. leased the service station property from Winthrop for a term ending in 1969, the property to be operated by the tenant as an automobile service station. The property had been under a similar lease to A. A. Bros. prior to 1952, at least since 1944, and the 1952 lease was a renewal of the previous arrangement. Clause 36 of the January 1, 1952, lease provided in pertinent part as follows: 36. (a) In consideration of the execution of the within lease and in order to induce the Landlord to let the premises herein described to the Tenant herein, the Tenant, for itself, its successors and assigns, subtenants, undertenants or those claiming under it or by virtue of it, does hereby covenant and agree that for and during the entire term hereby demised, that neither the said Tenant nor its legal representatives, successors or assigns, subtenants or undertenants or those claiming under it, or by virtue of it, will, or permit any one else to store, handle, sell, offer for sale, advertise for sale, use or permit to be used upon *58 the premises or any part thereof or adjacent thereto, any gasoline, oil or other petroleum products, other than that supplied by the Landlord or such company as the Landlord shall designate. (b) It is further understood and agreed that the said Tenant, its successors, assigns, subtenants, undertenants or those claiming under it or by virtue of it shall purchase and acquire from the Landlord or any company duly designated by it, all its requirements of gasoline, oil or other petroleum products, which is, or is to be stored, handled, sold, offered for sale, advertised for sale or used upon the demised premises or any part thereof or adjacent thereto * * * (c) * * * the Landlord covenants that it will itself, or through such company as it shall designate, supply all of the requirements of gasoline, oil or other petroleum products which the Tenant, its successors or assigns, subtenants, undertenants or those claiming under or by virtue of it shall require for resale at the above described premises. (d) It is understood that the Tenant, its successors or assigns, subtenants or undertenants or those claiming under it or by virtue of it, will accept any brand of gasoline, oil or other *59 petroleum products designated by the Landlord and which brand said Landlord, its successors or assigns or designees may change from time to time, provided the said gasoline shall be a product of one of the following major oil companies to wit: Tidewater Oil Sales Corp.; Shell Oil Corp.; Esso Oil Corp.; Texas Oil Corporation or Gulf Oil Corp. or a product of any successor of any of said companies. (e) Said Landlord, its successors or assigns or designees as aforestated shall have the right (but shall not be required) from time to time to enter upon the premises for the purpose of painting any signs, pumps or other equipment which may be on the premises in the identifying colors of the brand of gasoline to be supplied at the premises designated by the Landlord. (f) The rights afforded to the Landlord by this paragraph shall enure to it, its successors or assigns or any company with which it may be associated or any company which shall be designated by it or its successors or assigns. * * *
(j) Should there be any breach in any of the provisions contained in this paragraph, the Landlord shall have the right to terminate this lease on giving to the Tenant two days notice of *60 its intention so to do, * * * (k) The Landlord as an additional remedy but not as an exclusive remedy, shall be entitled to injunctive relief in the event of a default or violation of any covenants in this lease. (l) Landlord relies upon the provisions contained in this paragraph as the inducing cause for entering into this lease. (m) Should any portion of this paragraph for any reason be held invalid, or should Tenant ever contest its validity, Landlord may terminate this lease upon two days written notice to Tenant, * * * Both before and after 1952 the rent from the service station was paid to Rothafel and Diamond - not to Winthrop, the corporate lessor. Rothafel regarded the corporation as a mere legal formality and always considered himself and Diamond as the ones entitled to the rent. No corporate income tax returns have been filed by Winthrop since 1952. [1]
Because of Winthrop's control over the brand of gasoline and related products to be sold at the service station, Rothafel and Diamond had the potential to earn "commission" income from a large oil company in exchange for designating *61 such company as the exclusive supplier to the station. Tidewater Oil Company paid such commissions, based upon sales of its products at the station owned by Winthrop, from 1953 through 1958. [2]
During 1958 Tidewater became interested in dealing directly with the service stations controlled by Winthrop and the corporation described in footnote 2, supra. An agreement was reached between Tidewater and the individuals involved, pursuant to which Tidewater would purchase for lump-sum payments the rights to designate the supplier to these stations. [3] This agreement stated that $25,000 was to be paid "to *62 Winthrop Servicenter, Inc.," for Winthrop's right to designate the exclusive supplier to the Utica Avenue service station. The $25,000 was payable $13,000 one month after closing and $12,000 on or before January 15, 1959. Pursuant to this agreement of September 9, 1958, Winthrop "assigned" to Tidewater on October 8, 1958, as follows: all of the right title and interest of the party of the first part, in and to the agreement contained in clause 36 of a certain lease of a gasoline service station located at the northwest corner of Utica Avenue and Winthrop Street, Brooklyn, New York, dated January 1, 1952, between Winthrop Servicenter, Inc., as landlord, and A. A. Bros. Service Station, Inc., as tenant, for a term commencing January 1, 1952 and terminating December 31, 1969, which said clause 36, among other things, requires the tenant to purchase gasoline for the demised premises from the landlord or a company designated by landlord, and the said party of the first part *63 hereby irrevocably designates the party of the second part as the company from whom the tenant is required to purchase gasoline pursuant to said clause 36. * * *
Also on October 8, 1958, Winthrop executed a non-interest-bearing promissory note for $25,000 to Tidewater secured by a mortgage on the Utica Avenue property. Tidewater agreed not to enforce the note and mortgage as long as it continued exclusively to have its petroleum products sold from Winthrop's premises until December 31, 1969. In the event that Tidewater did not enjoy the premises as an exclusive outlet until such time, it would enforce the note for $25,000, less $185.19 for each month in which it did have the benefit of the premises as an exclusive outlet. Winthrop did not file an income tax return for 1958. Diamond and Rothafel, the 50-50 owners of all of Winthrop's stock, filed a partnership return for 1958 reporting thereon the rental income received from A. A. Bros. and the $25,000 income from the sale to Tidewater. The alleged partnership reported the $25,000 (less $500 expenses) as income received from the sale or exchange of a capital asset. Diamond and Rothafel filed joint individual income tax returns *64 with their respective wives for 1958, each showing therein his 50 percent interest in the purported partnership's net income. Opinion Petitioners do not dispute that they each received $12,250 from the above-described transaction with Tidewater in 1958 but they contend that these receipts were partnership gains from the sale of capital assets or assets used in a trade or business held for more than six months, as reported by them for 1958, and that therefore a long-term capital gain resulted and "petitioners should now receive capital gain treatment on the gain of $24,500.00." They also do not dispute that if the payment by Tidewater was not income of the partnership but instead was income of Winthrop, that their receipt of the net proceeds was a dividend of $12,250 apiece. No argument about that is raised or made on brief, the sole arguments being to the effect that Winthrop should be ignored as a corporate entity and that the sale of Tidewater was a sale by petitioners of assets resulting in a capital gain. In the notices of deficiency to Rothafel and Diamond, respondent determined that the $25,000 paid by Tidewater [4] should be treated as ordinary income to Rothafel and Diamond *65 - not capital gain as they reported it. Respondent asserts that at the time the deficiency notices were sent and at the time the instant litigation was commenced, he knew nothing of the existence of Winthrop and assumed that Rothafel and Diamond individually had entered into the transaction with Tidewater, as their partnership and individual returns indicated. Respondent asserts that it was not until between one and two weeks prior to trial that he learned, after obtaining documents from Tidewater, of the existence of the corporation - Winthrop. Upon learning that it was Winthrop which owned the Utica Avenue service station, that it was Winthrop which leased the station to A. A. Bros., and that it was Winthrop that entered into the $25,000 transaction with Tidewater, respondent determined that what really happened for tax purposes was *66 that Rothafel and Diamond received a dividend distribution from Winthrop in the amount of the proceeds from the Tidewater contract, and such dividend is taxable as ordinary income under section 301 of the Internal Revenue Code of 1954. Petitioners' only arguments with respect to the above-stated position of respondent are that the corporation was liquidated and/or that the corporate entity was merely an agent for holding title, that it was completely disregarded by the parties involved for all practical purposes, and that it should be disregarded for tax purposes as well. While we agree with petitioners' summary of the facts to the effect that no corporate income tax return was filed by Winthrop at least since 1952, and that apparently all disbursements were made by and receipts received by Rothafel and Diamond individually, we cannot agree that Winthrop was liquidated or that its corporate identity can be ignored for tax purposes. Winthrop not only owned the real property on which the service station stood and was operated, but it was the lessor to which the rights sold to Tidewater belonged. Winthrop contracted to sell these rights to Tidewater, and it *67 was Winthrop which assigned the rights and executed the promissory note and mortgage given to Tidewater to assure the rights in Tidewater's hands. The evidence simply does not support petitioners' contention that the corporation was liquidated or was merely the holder of bare legal title and solely an agent for petitioners. Even if we were inclined to agree with petitioners as to these facts, which we do not, we cannot ignore Winthrop's corporate entity for Federal income tax purposes here. Petitioners' argument completely ignores the by now well-established principle of Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). In that case the Supreme Court specifically rejected the argument, similar to that made in the instant case, that "the corporation 'was a mere figmentary agent which should be disregarded in the assessment of taxes.'" The Court stated, and we here reiterate, that the parties, having chosen to avail themselves of the advantages of holding title and transacting business in corporate form, cannot escape the income tax disadvantages of that choice. In support of their position, petitioners rely on Inland Development Co. v. Commissioner, 120 F. 2d 986 *68 (C.A. 10, 1941); and United States v. Brager Building & Land Corporation, 124 F. 2d 349 (C.A. 4, 1941). Both of these cases were tacitly overruled by the Supreme Court in Moline Properties, supra, at footnote 1 therein. Petitioners also rely on Miles v. Tomlinson, an unreported case (S.D.Fla., 1961), without citation to subsequent history which reveals that this decision was reversed on appeal, 316 F. 2d 710 (C.A. 5, 1963), certiorari denied, 375 U.S. 828. Respondent relies on Moline Properties, supra; Commissioner v. State-Adams Corporation, 283 F. 2d 395 (C.A. 2, 1960), certiorari denied 365 U.S. 844 (1961); and Given v. Commissioner, 238 F. 2d 579 (C.A. 8, 1956). It goes practically without saying that petitioners' contentions cannot be sustained. This case is clearly governed by the rule of Moline Properties, supra, and the other cases cited by respondent. We hold that Winthrop has performed the functions for which it was created and cannot be ignored for tax purposes. It follows that Rothafel and Diamond each received taxable dividend income from Winthrop in *69 the amounts determined by respondent. As a result of this disposition of the case we need not consider respondent's alternative contention that the rights sold were not assets subject to capital gain treatment. Decisions will be entered for the respondent. Footnotes
1. The record is unclear as to whether Winthrop ever filed an income tax return.↩
2. These commissions were not paid to Winthrop or to Rothafel or Diamond, but to a corporation owned equally by Rothafel, Diamond and two other individuals. By allowing Tidewater to deal with this other corporation with respect to products sold on its premises, Winthrop could receive a larger commission than if it dealt with Tidewater alone. This was so because the other corporation had control over several other service stations, and by control over a number of stations could command a higher price for such control. The tax consequences of these payments are not here in issue.↩
3. In some instances Tidewater purchased an assignment of the entire leasehold, but in the case of the station owned by Winthrop, it purchased only Winthrop's rights under clause 36 of the lease to A. A. Bros.↩
4. The September 9, 1958, contract with Tidewater provided that $12,000 of the total $25,000 consideration was to be paid on or before January 15, 1959. However, Diamond and Rothafel treated the entire $25,000 as income in 1958 and no contention has been made in the instant case that any portion of the $25,000 should be treated as 1959 income.↩